FILED

### UNITED STATES DISTRICT COURT
### FOR THE
### MIDDLE DISTRICT OF FLORIDA

2011 MAR -3 PM 1: 11

CLERK. US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

TODD TALIAFERRO; MAUREEN TALIAFERRO; ARTHUR M. MACIAG;
ALEXANDRIA A. MACIAG; DOUG SMITH; RICKIE A. CLEMMONS; TIMOTHY
SELL; JAMES W. CARELL; THOMAS K. HOYER; CAROLINE A. HOYER; BRUCE
L. FREEMAN; JILL J. FREEMAN; DEAN A. FRESONKE; STEPHANIE L.
FRESONKE; DAVID D. GARNER; STEPHEN M. TORMEY; DENISE M. TORMEY;
TOM G. HARVEY; SANDRA M. HARVEY,

                                Plaintiffs,

                                Case No. 3:11-cv-199-J-99mmH-JBT

vs.

DEFENDANTS ERG ENTERPRISES, LP; LUBERT-ADLER MANAGEMENT
COMPANY, LP; LUBERT-ADLER REAL ESTATE FUND III, LP; LUBERT-ADLER
REAL ESTATE PARALLEL FUND III, LP; LUBERT-ADLER CAPITAL REAL
ESTATE FUND III, LP; LUBERT-ADLER REAL ESTATE FUND IV, LP;
LUBERT-ADLER REAL ESTATE PARALLEL FUND IV, LP; LUBERT-ADLER
CAPITAL REAL ESTATE FUND IV, LP; LUBERT-ADLER REAL ESTATE
FUND V, LP; LUBERT-ADLER REAL ESTATE PARALLEL FUND V, LP; DEAN S.
ADLER; GINN WEST END GP, LLC; GINN-LA WEST END LTD, LLLP; GINN-LA
CS BORROWER, LLC; GINN-LA CONDUIT LENDER, INC.; GINN-LA CS
HOLDING COMPANY; GINN-LA OBB, LIMITED- CORP; GINN FINANCIAL
SERVICES; BAHAMAS SALES ASSOCIATE, LLC; GINN TITLE SERVICES, LLP;
EDWARD R. GINN, III; JOHN DOES 1-15,

                                Defendants.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

PLAINTIFFS, for their Complaint herein, allege as follows:

### JURISDICTION

1.    This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 18

U.S.C. § 1964(a) and (c).

2.    This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over

the state common-law claims alleged herein.

3.   This Court has personal jurisdiction over the Defendants and each of them pursuant to 18 U.S.C. §§ 1965(a) and (d).  This Court has personal jurisdiction over the Defendants and each of them because at all times relevant to this Complaint, Defendants, either individually or through their agents, officers or representatives, engaged in and carried on business activities in the State of Florida relating to the allegations herein; maintained business offices in the State of Florida; committed statutory violations within the State of Florida, as alleged herein; and caused injuries to Plaintiffs that arose out of acts or omissions that occurred within the State of Florida, as alleged herein.

## VENUE

4.   Venue for this action is appropriate in this Court under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and division, and because several of the Defendants reside and/or transact business in this district and division.

## THE PARTIES

5.   Plaintiffs Todd Taliaferro and Maureen Taliaferro ("Taliaferro") are and, at all times relevant to the allegations herein, were residents of the State of Michigan who purchased an undeveloped parcel of real property, Lot 208, in the Ginn Sur Mer subdivision on Grand Bahama Island ("GSM" or the "GSM Subdivision").

6.   Plaintiffs Arthur M. Maciag and Alexandria A. Maciag ("Maciag") are and, at all times relevant to the allegations herein, were residents of the State of Michigan who purchased an undeveloped parcel of real property, Lot 109, in GSM.

2

7.   Plaintiff Doug Smith ("Smith") is and, at all times relevant to the allegations herein, was a resident of the State of Tennessee who purchased an undeveloped parcel of real property, Lot 498, in GSM.

8.   Plaintiff Rickie A. Clemmons ("Clemmons") is a resident of the State of North Caroline and, at certain times relevant to the allegations herein, was a resident of the State of Louisiana.  Timothy Sell is, and at all times relevant to the allegations herein, was a resident of the State of Michigan.  Rickie Clemmons and Tim Sell (Clemmons Group) purchased an undeveloped parcel of real property, Lot 494, in GSM.

9.   Plaintiff James W. Carell is, and at all times relevant to the allegations herein, was a resident of the State of Tennessee.  Timothy Sell is, and at all times relevant to the allegations herein, was a resident of the State of Michigan.  Timothy Sell and Jim Carell ("Carell Group") purchased an undeveloped parcel of real property, Lot 312, in GSM.

10.   Plaintiffs Thomas K. Hoyer and Caroline A. Hoyer are residents of the State of Texas and at certain times relevant to the allegations herein were residents of the State of North Carolina.  Bruce L. Freeman and Jill J. Freeman are and, at all times relevant to the allegations herein, were residents of the State of North Carolina.  Plaintiffs Thomas K. Hoyer, Caroline A. Hoyer, Bruce L. Freeman and Jill J. Freeman  ("Hoyer Group") purchased an undeveloped parcel of real property, Lot 448, in GSM.

11.   Plaintiffs Dean A. Fresonke, Stephanie L. Fresonke, David D. Garner, Stephen M. Tormey, Denise M. Tormey, Tom G. Harvey and Sandra M. Harvey ("Fresonke Group") are and, at all times relevant to the allegations herein, were residents of the State of Florida who purchased an undeveloped parcel of real property, Lot 437, in GSM.

12.   Defendant Lubert-Adler Management Company, LP d/b/a Lubert-Adler Partners, LP ("Lubert-Adler") is a Delaware limited partnership with its principal place of business in Philadelphia, PA.  Defendant Lubert-Adler is a private-equity fund management company that invests and participates in real estate development projects. As of mid-2006, Defendant Lubert-Adler had invested over $800 million in Ginn development projects.

13.   Defendant Lubert-Adler is the ultimate parent company of Defendants Lubert-Adler Real Estate Fund III, LP; Lubert-Adler Real Estate Parallel Fund III, LP and Lubert-Adler Capital Real Estate Fund III, LP (collectively "Lubert-Adler Fund III"); Lubert-Adler Real Estate Fund IV, LP; Lubert-Adler Real Estate Parallel Fund IV, LP and Lubert-Adler Capital Real Estate Fund IV, LP (collectively "Lubert-Adler Fund IV"); Lubert-Adler Real Estate Fund V, LP and Lubert-Adler Real Estate Parallel Fund V, LP (collectively "Lubert-Adler Fund V").  Defendants Lubert-Adler Funds III, IV and V each held an 80% equity interest in the Ginn entities in which those Funds were invested, including but not limited to Defendants Ginn-LA CS Borrower, LLC; Ginn-LA CS Holding, Ginn-LA West End LLLP and Ginn-LA Conduit Lender (collectively Ginn-LA Entities").

14.   Defendant Dean S. Adler is an individual who co-founded and co-owns (with Ira M. Lubert) Defendant Lubert-Adler and Lubert-Adler Funds III, IV and V.

15.   Defendants Lubert-Adler and Dean Adler had control of the Ginn-LA Entities. At all material times hereto, Defendants Lubert-Adler and Dean Adler knew of, managed, controlled, ratified and/or participated in the actions of the Defendant Ginn-LA Entities named herein.  Defendants Lubert-Adler and Dean Adler had actual knowledge or

4

knowledge fairly implied on the basis of objective circumstances, of the acts of the Defendant Ginn-LA Entities named herein, as well as of the acts of Bobby Ginn.

16.  Defendant Ginn West End GP, LLC ("Ginn West End") is a Georgia limited liability company formed on October 28, 2004, with its principal place of business located in Palm Coast, Florida.

17.  Defendant Ginn-LA West End Ltd, LLLP ("GLA West End LLLP") is a Georgia limited liability limited partnership formed on November 2, 2004, with its principal place of business located in Palm Coast, Florida.

18.  Defendant Ginn-LA CS Borrower, LLC ("CS Borrower") is a Delaware limited liability company formed on April 18, 2006, with its principal place of business located in Palm Coast, Florida.

19.  Defendant Ginn-LA Conduit Lender, Inc. ("Conduit Lender") is a Delaware corporation formed on May 5, 2006, with its principal place of business located in Celebration, Florida.

20.  Defendant Ginn-LA OBB, Limited-Corp. ("GLA OBB") is a Bahamian corporation formed on December 21, 2006, with its principal place of business located in Palm Coast, Florida.

21.  Defendant ERG Enterprises, LP ("ERG ") is a Georgia limited partnership formed on December 29, 2005, with its principal place of business located in Palm Coast, Florida.

22.  Defendant Ginn Financial Services, LLC ("Ginn Financial") is a Georgia Limited Liability Company formed on June 10, 2005, with its principal place of business located in Palm Coast, Florida.

23.  Defendant Bahamas Sales Associate, LLC ("Bahamas Sales") is a Delaware corporation formed on August 4, 2006 with its principal place of business located in Palm Coast, Florida.  Bahamas Sales was formed

24.  Defendant Ginn Title Services, LLC ("Ginn Title") is a Georgia Limited Liability Company formed on September 13, 2005 with its principal place of business located in Palm Coast, Florida.

25.  Defendant Edward R. Ginn, III ("Bobby Ginn") resides at 42 Island Estates Parkway, Palm Coast, Florida 32137.

26.  Each Defendant is sued individually as a primary violator and as an aider and abettor.  In acting to aid and abet the commission of the fraud and other wrongful conduct complained of herein, each Defendant acted with an awareness of the fraud and other wrongful conduct.  Each Defendant rendered substantial assistance or encouragement to the accomplishment of that fraud and was aware of its overall contribution to the conspiracy, scheme, and common course of wrongful conduct alleged herein.

27.  Each Defendant is joined in this action as a co-conspirator.  Liability arises from the fact that each Defendant entered into an agreement with the other Defendants to commit or to participate in the commission of all or part of the unlawful acts, plans, schemes, transactions and artifices to defraud described above.

### FACTUAL BACKGROUND: Credit Suisse Credit Facility Fraud

I.  **August 2005:  Initial GSM Developer Ginn-LA West End Limited Enters into a Heads of Agreement with the Bahamian Government**

28.  On December 9, 2005, Ginn-LA West End Limited ("GLA Limited"), as the initial developer of GSM, entered into a Heads of Agreement with the Bahamian

government. The Heads of Agreement provided GLA Limited with governmental cooperation and concessions on transfer taxes, duties and work permits.

29. The Heads of Agreement stated that GLA Limited intended to master develop 1,957 acres of real property on Grand Bahama Island into a resort community.

30. The Heads of Agreement stated:

a. "The parties recognize that timing is critical, as to commencement and timely completion of all phases of the Project . . ."

b. "The Developer intends to sell residential lots and units within the Project prior to the installation of the Project's infrastructure. These pre-sales are an important part of the sales and marketing of the Project."

c. "The beneficial owners of the Development are Edward R. Ginn, III and private investments funds which are controlled by Dean Adler and Ira Lubert."

III. **June 8, 2006: Defendants CS Borrower and Conduit Lender Close the $675 Million Credit Suisse Credit Facility and Distribute $510 Million**

A. **The Credit Suisse Syndicated Term Loan Was A New and Unique Loan Product Offered By Credit Suisse**

31. Around early 2005, Credit Suisse began marketing a new loan product referred to as a syndicated term loan.

32. One entity that took out a Credit Suisse syndicated term loan was the Yellowstone Mountain Club in Montana ("Yellowstone"). Sometime after it received its Credit Suisse loan, Yellowstone fell into bankruptcy. In Adversary Proceedings in the Yellowstone bankruptcy (U.S. Bankruptcy Court for the District of Montana, Case No. 09-00014), the Court issued a June 11, 2009 Memorandum of Decision (Doc. No. 292) that set forth the following facts:

a. "In or around December of 2004, Jeffrey Barcy ("Barcy"), a Director in Credit Suisse's Investment Banking Division, made several attempts to send Blixseth [an owner of Yellowstone] and his secretary or assistant emails that contained a two to three-page teaser, providing Blixseth with a brief overview of Credit Suisse and its new loan product referred to as a syndicated term loan, which was described to Blixseth as something akin to a 'home-equity loan.'" (Yellowstone Memorandum of Decision at 22.)

b. "Credit Suisse was specifically trying to 'break new ground with a product by doing real estate loans in the corporate bank loan market.' Through its new syndicated term loans, Credit Suisse was able to offer a loan product the size of which had previously been unavailable to borrowers." (*Id.* at 22-23.)

c. "Barcy testified that Credit Suisse's syndicated loan product had previously been marketed to other master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn, Turtle Bay, and Lake Las Vegas. Each of the above entities received a syndicated loan from Credit Suisse's Cayman Islands branch, which allowed the equity holders in said entities to take sizeable distributions from all or part of the Credit Suisse loan proceeds." (*Id.* at 23.)

d. "Similar to the syndicated loans to Tamarack Resort, Promontory, Ginn, Turtle Bay and Lake Las Vegas, the Yellowstone Club Credit Agreement was originally drafted to provide that the proceeds of the loan would be used, in part, for 'distributions' to members of the Borrow for purposes unrelated to the Yellowstone Development." (*Id.* at 24.)

e.   "As previously noted, the transfer of loan proceeds out of the Yellowstone Club

was a key feature of the product that Credit Suisse used to sell the loan.

Yankauer testified that the cornerstone of this loan product was that it allowed

preferred resort owners, such as Blixeth, to capitalize on the value of their asset."

(*Id.* at 28.)

33.   Before Yellowstone Club obtained its Credit Suisse loan, Cushman & Wakefield

was retained to conduct an appraisal of Yellowstone Club property.  Cushman's appraisal

was based on future cash flow projections provided by the Yellowstone Club.

**B.   Defendants CS Borrower and Conduit Lender Secretly Obtain the $675
Million CSCF**

34.   In late 2005 or early 2006, Credit Suisse contacted either Bobby Ginn or Lubert-

Adler to offer the opportunity to take one of Credit Suisse's new Syndicated Term Loans.

35.   Bobby Ginn, Dean Adler, or both, had a series of communications with Credit

Suisse concerning whether, and on what terms, Ginn and Lubert-Adler might take a

Credit Suisse Syndicated Term Loan.

36.   On March 30, 2006, Defendant GLA West End LLLP executed an "Engagement

Letter" with Credit Suisse "in connection with seeking senior secured credit facilities in

an aggregate principal amount of up to $[800,000,000]."

37.   Based on his education, background and extensive experience in the real estate

investment field, Defendant Dean Adler knew the Syndicated Term Loan offered by

Credit Suisse was a new and unique loan product, the size, terms and structure of which

had never before been available to borrowers.

38.   Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Dean Adler, ERG,

Ginn West End and Ginn-LA West End LLLP caused Defendants CS Borrower and

Conduit Lender to be formed for the sole purpose of serving as the borrowers (collectively "CSCF Borrowers) under a $675 million credit facility with Credit Suisse in the spring of 2006 ("CSCF").

39.   Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Dean Adler, ERG and GLA West End LLLP caused CSCF Borrowers to enter into the $675 million CSCF so that Lubert-Adler and ERG could take a $333 million distribution from the proceeds of the CSCF.

### C. How did Defendants CSCF Borrowers Obtain the $675 Million CSCF?

40.   The CSCF was obtained by cross-collateralizing five Ginn-LA real estate developments, four of which were located in the United States ("CSCF Developments"):

a.   Tesoro, in Port St. Lucie, Florida;

b.   Quail West, in Naples, Florida;

c.   Hammock Beach River Club, in Palm Coast, Florida;

d.   Laurelmor, in North Carolina; and

e.   GSM, on Grand Bahama Island.

41.   A "Property Overview" in the Confidential Information Memorandum projected future lot sales in each of the CSCF Developments as follows:

a.   Ginn would sell 1,858 lots in the GSM development by 2010, with no lots under contract as of May 2006.

b.   Ginn would sell 397 lots in the Tesoro Project in Florida by 2009, with only 11 lots under contract as of May 2006.

c.   Ginn would sell 290 lots in the Quail West Project in Florida by 2008, with only 25 lots under contract as of May 2006.

    d. Ginn would sell 453 lots in the Hammock Beach River Club development in Florida by 2008, with no lots under contract as of May 2006.

    e. Ginn would sell 1,500 lots in the Laurelmor development in North Carolina by 2010, with no lots under contract as of May 2006.

42. In fact, the projected future lot sales for the CSCF Developments were speculative and vastly overstated. For example:

    a. Tesoro (owned by Defendants ERG 20% and Lubert-Adler 80%) held an extravagant "launch" event in October 2005, during which it obtained sales reservations or contracts for nearly all of the approximately 450 residential lots that were offered and nearly half of the 100 available condominium units. However, following Hurricane Wilma in late October 2005, the vast majority of the Tesoro contracts and sales reservations were cancelled or failed to close.

    b. Quail West (owned by Defendants ERG 20% and Lubert-Adler 80%) held an extravagant "launch" event in December 2005, during which it obtained sales reservations or contracts for nearly all of the approximately 450 residential lots that were offered. However, following Hurricane Wilma in late October 2005, the vast majority of the Quail West contracts and sales reservations were also cancelled or failed to close.

43. In order to obtain the CSCF, Defendants CSCF Borrowers, Lubert-Adler and Dean Adler provided Credit Suisse with Project Projections of cash flow from estimated future lot sales in the CSCF Developments ("CSCF Project Projections"). Those Defendants also provided the CSCF Project Projections to Cushman & Wakefield, which had been designated as the "appraiser" for the CSCF.

11

44.  Cushman & Wakefield used the CSCF Project Projections to determine the "Total Net Value" ("TNV") of the CSCF Developments.  The Total Net Value of the CSCF Developments was critical to determination of the total amount that could be borrowed under the CSCF.  The higher the TNV assigned to the CSCF Developments, the higher the amount that could be borrowed under the CSCF.

45.  Although the CSCF credit agreements refer to Cushman & Wakefield as the "Appraiser" for the CSCF Developments and refer to the TNV as a "Qualified Appraisal," the TNV valuation was not an appraisal in any sense of the word.

46.  Cushman & Wakefield was initially retained by Credit Suisse to provide a TNV "appraisal" in connection with the Yellowstone Credit Suisse loan.  According to testimony in the Yellowstone Bankruptcy proceeding Credit Suisse engaged Dean Paauw of GSM to provide the TNV "appraisal" of the Yellowstone property.

47.  Paauw testified in the Yellowstone Bankruptcy proceeding that prior to being contacted by Credit Suisse, he had never done or heard of a TNV "appraisal" despite having done approximately 400-500 appraisals in his professional career.

48.  Paauw testified in the Yellowstone Bankruptcy proceeding that he did not know where the definition for TNV had come from and that the TNV "appraisal" did not comply with the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") because it was not an "As Is" or "Market Value" appraisal.  In practice, a TNV valuation is a discounted cash flow analysis that does not apply a discount rate for revenue expected in the future.

49.  The Cushman & Wakefield appraisals defined the "Total Net Value" of each CSCF Development as "the sum of the market value of the bulk lots of the entire planned

community, as if all of the bulk lots were complete . . . and available for sale to merchant builders, as of the date of the appraisal," without deduction or discounting for pertinent risk factors or the time value of money.

50.   The TNV methodology was designed to generate a value that significantly exceeded the actual as-is fair market value of the property interests being valued.  In this way, the TNV methodology allowed the CSCF to have a much lower "loan to value" ratio than would otherwise have been possible using a traditional market valuation of the proposed collateral.

51.   By virtue of the TNV methodology the CSCF did not comply with U.S. banking laws, such as the Financial Institutions Recovery Reform Act of 1989 ("FIRREA"), which provides that, before a regulated financial institution may make or invest in a loan secured by real estate, the loan must be supported by an appraisal reflecting a traditional market valuation of the proposed collateral.

52.   To circumvent this requirement, Credit Suisse coordinated the CSCF through its "Cayman Islands Branch," an off-shore "affiliate" with no physical presence in the Cayman Islands, and syndicated the loan to non-regulated entities, such as hedge funds.

53.   Defendants Lubert-Adler, Lubert-Adler Funds III and IV, Dean Adler and ERG knew the TNV method resulted in "appraisals" for the CSCF Developments that were vastly overstated.  In fact, after the closing of the CSCF, Bobby Ginn reportedly boasted that it was "the best sales job of [his] life."  For example:

a.   Whereas the St. Lucie County Property Appraiser assessed the value of Tesoro real and tangible property in 2006 at $74,910,626, the TNV of unsold Tesoro lots on April 14, 2006 was $210 million.

b.   Even though Ginn and Lubert-Adler missed the original projections for the Tesoro 2005 launch by a huge margin (projecting 421 lot closing by January 31, 2006 but closing 40 or less), the Project Projections for Tesoro forecasted 74 additional lot and condominium closings during the second half of 2006, with 290 more by the end of 2008.  In actuality, there were fewer than 40 additional lot closings (and no condominium closings) in Tesoro through 2008.

c.   Even though the GSM Land was purchased in August 2005 for $24.5 million, the TNV for GSM was $618 million on June 8, 2006.

54.   The cash flow Project Projections the CSCF Borrowers provided to Cushman & Wakefield in support of the TNV "appraisal" for GSM were speculative, unreasonable and unsupported by historical information.

55.   In addition the Project Projections incorporated the assumption that all marketed amenities for GSM (not just the contractually-required infrastructure) would be developed.  At the time of the GSM Project Projections:

a.   The GSM Land was undeveloped;

b.   The initial developer of GSM had not yet secured approval from HUD to market GSM lots in the United States;

c.   There was no history of GSM lot sales supporting the lot sales prices set forth in the Project Projections;

d.   There were no lot appraisals supporting the lot sales prices set forth in the Project Projections; and

e.   There were purportedly 3,000 GSM lot reservations and 158 powers of attorney for GSM lot purchases, but no contracts for the purchase of GSM lots.

14

56. In an effort to boost the TNV for GSM, CSCF Borrowers, Lubert-Adler and Dean Adler dramatically increased the projected number of lot sales from the numbers set forth in the December 9, 2005 Heads of Agreement with the Bahamian government. While the original Heads of Agreement contemplated 870 residential lots, the March 31, 2006 Project Projections more than doubled the projections for GSM residential lots to 1,858.

57. Based on the average price per lot used in the Project Projections, the sudden increase in projected lot sales from 870 to 1,858 boosted the projected future Total Lot Sales from $636 million to more than $1.36 billion.

58. Not coincidentally, GSM's initial developer on June 8, 2006 (the date of the CSCF closing) entered into an amendment to the Heads of Agreement to increase the number of residential lots from 870 to 1,890 and to increase the number of condominium units from 4,400 to 4,900.

59. The TNV for all five CSCF Developments was set at approximately $1.5 billion. The TNV for GSM accounted for 41% of this overall amount.

60. The TNV "appraisals" were used to inflate the size of the CSCF to $675 million. Without the use of the overstated TNV "appraisal," Defendants CSCF Borrowers would not have been able to secure the $675 million CSCF.

61. Because it was based on the TNV of CSCF Developments:

a. The size of the $675 million CSCF was not reasonable in comparison to the actual value of the collateral represented by the CSCF Developments.

b. The CSCF utilized speculative projections of future value to create a current debt service obligation in the amount of $675 million.

c. The $675 million CSCF carried an excessive risk of failure.

62.   Internal documents and statements by Lubert-Adler, Dean Adler and Bobby Ginn (both before and after the CSCF closing) reveal that those defendants recognized the real estate market crash in late 2005 and the first half of 2006. Those defendants therefore knew the projected future lot sales for the CSCF Developments were overstated and without justification. For example:

a. In April 2006, approximately six weeks prior to the CSCF closing, Bobby Ginn, Dean Adler and others received a memorandum from Morris, Manning & Martin, LLP attorney John G. "Sonny" Morris, titled "CSFB Financing / Concerns About Repayment and Presales." According to the bankruptcy trustee for the Tesoro and Quail West developments in an adversary proceeding to void certain aspects of the CSCF as fraudulent transfers, the Sonny Morris memo "foreshadowed a series of problems the proposed borrowers could expect to encounter given the size of the loans they were attempting to procure and the terms of the loans under discussion." (Memo, J. Morris to B. Ginn, D. Adler, etc., 4/19/06, MMMTQW01-024197 – 024201.)

b. In May 2006, after having spoken to Dean Adler, Sonny Morris reported, "[Adler] is greatly concerned that a failure to meet projections will result in a default." (Email, J. Morris to B. Masters, etc., 5/26/06, MMMTQW01 - 0224495.)

c. In May 2006, Lubert-Adler principal Robert Rosenberg suggested Lubert-Adler might use the market downturn as a selling point in order to obtain approval from the Advisory Boards for Lubert-Adler Funds III and IV for the CSCF: "we could

point out that the pace of sales at Tesoro has recently begun to slow, thereby making it increasingly likely that the Fund III investors will not get to a $36M profit point in the near-term future [absent the CSCF]." (Email, R. Rosenberg to D. Adler, etc., 5/3/06, forwarded to J. Morris, etc., 5/4/06 - 5/5/06, MMMTQW01_024124 -024125.)

d.  According to the Tesoro/Quail West bankruptcy trustee, Credit Suisse was so anxious about "market conditions" in June 2006 that it strenuously advised against "any material change in structure [that] may cause us to have to go back out to investors and reconfirm their orders," or would otherwise result in "any kind of a delay." (Email, M. Speller to B. Wobeck, etc., 6/6/06, MMMTQW01-024460 – 024467.)

e.  In April 2007, Ginn-LA C.F.O. John P. Klumph expressed "concerns" that "the Lenders could second guess the completeness of the [pre-loan] disclosure" in light of a failure to account for dozens of Tesoro and Quail West contract cancellations.  He advised that "[i]n the detailed reports to be provided going forward [he was] planning to show total contracts and cancellations for 2006 only as of year end so as not to draw unwarranted attention to the issue." (Email, B. Wobeck to J. Morris, etc., 4/30/07, MMMTQW01_006138 – 006140.)

f.  In June 2007, Lubert-Adler principal and Head of Asset Management, Stuart A. Marguilies, sent and email stating – with respect to "Future Sales" – "In the current climate and foreseeable future, sales forecast[s] are unreliable even at reduced levels.  Accordingly, sales proceeds are not a reliable funding source [for

loan repayment]. (Email, S. Marguilies to R. Rosenberg, J. Klumph, J. Morris, 6/6/07, LA051640 – 051642, MMMTQW01_021877.)

g. In a July 23, 2008 conference call with certain Ginn owners, Bobby Ginn admitted that the real estate market crash prior to the CSCF was unprecedented: "The market crash[] from the end of 2005 . . . to July of 2006 was as big a falloff in housing as I have ever seen in 40 years. . . . The market was going bad from the end of 2005 through the entire year of 2006, but the first six months of 2006 was brutal. I mean it's like somebody threw a rock off the ledge, it was sharp and [a] long downhill fall...."

h. According to the Tesoro/Quail West bankruptcy trustee, "Ginn and Lubert-Adler records reveal that, during the third quarter of 2006, total net revenues at Tesoro and Quail West were approximately 3% of previously forecasted amounts, due to 'the lack of real estate sales.'"

i. According to the Tesoro/Quail West bankruptcy trustee, "By mid-2007, Ginn and Lubert-Adler were formally reporting to the Lenders that '[t]he slowdown in the residential real estate markets ha[d] adversely impacted the Borrower's project sales and, as a result, its ability to comply with the terms of the existing credit agreements.' In addition, they acknowledged that, '[d]ue to the significant shortfall in expected sales to date, the Borrower must source outside capital in order to fund the key infrastructure and amenities costs.' (E.g., Ginn Lender Presentation, 4/23/07, LA050798 – 050827; 6/21/07 LA053007 – 053042.)"

j. According to the Tesoro/Quail West bankruptcy trustee, "In early 2008, as it became harder for Ginn and Lubert-Adler to deny that they had, in fact,

'doomed' the Projects 'to failure,' Ginn-LA representatives and attorneys met several times to discuss potential bankruptcy filings for the Debtors [Tesoro and Quail West] and Other Project Entities, and various issues relating thereto, including:

- '[The] need [for] a bankruptcy plan';
- 'Conflicts issue[s]';
- 'Substantive consolidation';
- 'Separation of entities';
- 'Debt goes across all projects';
- 'Need to figure out how to strip off debt per property';
- 'How to separate each project's liabilities';
- 'Does each entity have to stand for repayment as a whole';
- 'Are there grounds for piercing the corporate veil'; and
- 'Return of equity at original closing → fraudulent conveyance.'

(E.g., Handwritten Notes / Emails, 3/28/08 – 4/30/08, MMMTQW01_031126, 031120 – 031125, 031295, 031103.)"

k.   According to the Tesoro/Quail West bankruptcy trustee, with respect to the distribution to Lubert-Adler and ERG, "the concern among those involved was that the '[d]istribution to Equity from [the] original closing could be challenged as [a] fraudulent conveyance,' because 'the debtors … did not get reasonably equivalent value [therefor],' and '[the] conveyance [was one] which rendered the debtors insolvent or unreasonably capitalized.' (Handwritten Notes of Mtg., MMMTQW01_016232.)"

63.   Defendants GLA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 34-62, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

**D.     How Were CSCF Borrowers Planning to Repay the $675 Million CSCF?**

64.   To obtain the CSCF, it was necessary for Lubert-Adler, Dean Adler, ERG and CSCF Borrowers to allocate the future cash flow from lot sales in GSM (and the other CSCF Developments) to meet repayment obligations under the CSCF, instead of allocating cash flow from lot sales in the CSCF Developments to the benefit of each development as an independently capitalized development subject to its own market conditions.

65.   The ability of CSCF Borrowers to service the debt under the $675 million CSCF was dependent on cash flow from future "projected" lot sales in the CSCF Developments:

   a.   Tesoro:  14%

   b.   Quail West:  10%

   c.   Hammock Beach:  6%

   d.   Laurelmor:  29%

   e.   GSM Subdivision:  41%

66.   The Projections called for 59% of the cash flow for CSCF repayment to come from future lot sales in four CSCF Developments in the United States.

67.   The CSCF required that repayment using 100% of excess cash flow until one-half of the first-lien balance was repaid.  Thereafter, 50% of excess cash flow was required to be applied to outstanding balances.  Thus, 100% of excess cash flow from the

sale of every lot in the CSCF Developments was funneled to Credit Suisse in service of the CSCF debt obligation.

68.   Under the terms of the CSCF, if the U.S. CSCF Developments did not meet lot sales projections, Defendant GLA West End LLLP was required to loan the U.S. CSCF Developers the funds necessary to meet their CSCF repayment obligations ("GSM Shortfall Obligations").

69.   Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 64-68, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

**E.     How Was the $675 Million CSCF Secured?**

70.   The $675 million CSCF was collateralized across all five CSCF Developments: substantially all assets of CSCF Borrowers and each development, including all land and improvements, were pledged by Lubert-Adler, Lubert-Adler Funds III and IV, Ginn-LA CS Holding, ERG and Ginn-LA West End LLLP to secure the CSCF.

71.   Lubert-Adler, Lubert-Adler Funds III and IV, Ginn-LA CS Holding, ERG and Ginn-LA West End LLLP also pledged as collateral under the CSCF their ownership interests in the developer companies for each CSCF Development, including all company assets and rights of control.

72.   GSM, along with Defendants GLA West End LLLP and Ginn West End GP were responsible for the entire amount of the $675 million CSCF.

73.   First, the CSCF was secured by a $276 million mortgage on all 1,957 acres of the GSM Land.  More specifically, the CSCF was secured by a collateral assignment of

an intra-company note and mortgage on the GSM Land given by initial GSM developer GLA Limited to Defendant Conduit Lender.

74.   Second, Lubert-Adler and ERG pledged their ownership interests in Defendants GLA West End LLLP and Ginn West End, which interests included all company assets, rights over the control of future development of GSM, "developer" status under the "Heads of Agreement" with the Bahamian government, control over the GSM Home Owners Association, control over the GSM CC&Rs (which run with the title to Plaintiffs' lots and govern Plaintiffs' rights and obligations in connection with the ownership of their lots), control over operation of GSM Club Operation, and control over the GSM Architectural Control Board.

75.   Defendant GLA West End LLLP (the ultimate parent company for the initial developer of GSM: GLA Limited), in turn, guaranteed the obligations under the $675 million CSCF by a pledge of 65% of its interests in the immediate parent company for the initial developer of GSM: GLA Limited) and 100% of its interests as the sole owner of Defendant Conduit Lender, including its management and control rights in both entities.

76.   Although Defendants Lubert-Adler, Lubert-Adler Fund IV and ERG guaranteed the pledge of their interests in Defendant GLA West End LLLP and Ginn West End, those guarantees were non-recourse as to Lubert-Adler, Lubert-Adler Fund IV and ERG. Thus, even though the GSM development was liable for the entire $675 million CSCF, Lubert-Adler, Lubert-Adler Fund IV and ERG made sure they had no liability for the $675 million CSCF debt.

77.   Even though ownership and control of GSM were pledged as collateral for the CSCF, the CSCF was not intended to – and did not – benefit GSM.  To the contrary, the

CSCF prevented future GSM development and exposed GSM purchasers, including Plaintiffs, to risk of a CSCF default and foreclosure.

78.   From the June 8, 2006 CSCF closing, GSM was bound to the success or failure of the U.S. CSCF Developments.  If the U.S. CSCF Developments failed to generate sufficient cash flow to meet CSCF repayment obligations, the entire risk of default fell on GSM.

79.   In light of the terms of the CSCF, GSM lot owners, including Plaintiffs, were unknowingly investing in all five of the CSCF Developments.

80.   Defendants GLA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 70-79, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

**F.     What Happened to the $675 Million Borrowed Under the CSCF?**

81.   The terms of the CSCF provided that less than a quarter of the CSCF proceeds would be used for working capital or development purposes:  only the $165 million synthetic revolving loan was to be maintained in a deposit account "to fund general company and working capital needs" and "to finance a portion of the development, construction and other costs associated with each Project."

82.   On the June 8, 2006 CSCF closing date, CSCF Borrowers sent "irrevocable" notices to Credit Suisse requesting disbursement of $510 million.  From that amount, the CSCF required distributions of $333,125,000 to Lubert-Adler Funds III and IV and ERG ("CSCF Distribution").

83. CSCF loan proceeds were also applied "to repay "Existing Indebtedness" of the CSCF Developments. Of roughly $158 million used to repay Existing Indebtedness, only about $12 million was applied to Existing Indebtedness for GSM.

84. Prior to the CSCF, the only Existing Indebtedness of GSM was a mortgage on GSM Land for $12 million. Although that mortgage note was paid off with CSCF proceeds, it was replaced by a mortgage note of more than $276 million on GSM Land and liability for the entire $675 million CSCF.

85. Of $510 million taken by CSCF Borrowers on the CSCF closing date, 64% went to "distributions" to ERG and Lubert-Adler; 29% went to existing indebtedness for other Ginn developments, 5% went to transaction costs, and only 2% went to existing indebtedness for GSM.

86. Defendants GLA West End LLLP, Lubert-Adler, Dean Adler and ERG knew the facts set forth in Paragraphs 81-85, above, but fraudulently concealed those facts from prospective purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

**G.     What Happened to $333 Million Distributed to Lubert-Adler and ERG?**

87. Defendants Lubert-Adler and ERG have never revealed what became of the $333 million distribution they took from the $675 million CSCF.

88. It was common knowledge among GSM sales persons in Summer 2006 that Bobby Ginn took a large loan and used the money to purchase a NASCAR racing team.

89. It was initially announced in 2006 that Ginn Clubs & Resorts agreed to become the primary sponsor for MB2 Motorsports for a limited number of races in 2006. In July 2006, Bobby Ginn became the majority owner (80%) of MB2 Motorsports, which raced as the NASCAR Nextel Cup series team Ginn Racing.

90.  Bobby Ginn poured millions into the NASCAR team within a short period of time.  He purchased a $2.5 million "7-post shaker," a piece of equipment for chassis building that only the wealthiest multi-car NASCAR teams actually owned instead of leasing.  He expanded the two-car team to three, and he purchased at least two private jets for the team. Bobby Ginn spent tens of millions to upgrade the race team.

91.  Ultimately, Bobby Ginn's foray into NASCAR has been called the quickest and most dramatic rise and fall of a race team in recent NASCAR history.  One commentator in mid-2007 described Bobby Ginn's approach to NASCAR in terms that could apply just as easily to his role in the GSM debacle:

> Since owner Bobby Ginn purchased the two-team organization formerly known as MB2 Motorsports from its previous majority owner Nelson Bowers barely a year ago, what the NSACAR community has witnessed is an illusion, a highly calculated gamble, based on maintaining an appearance of stability to gain acceptance within the sport in hopes of securing significant outside financing, money that was desperately needed to continue the charade.  And it was a fairly well orchestrated deception …one that almost worked.  The plan's down fall was simply that no corporate sponsor was ever found that would take the bait that Bobby Ginn set out, and the ruse has now begun to unravel.

IV.    **The $675 Million CSCF Prevented Development of Amenities Planned and Marketed for GSM**

92.  In a June 2005 letter to the Bahamian government, a Bahamian attorney for GSM, Terence Gape, described Ginn Development Company's strategy for marketing and developing residential resort communities:

> Ginn have been successful because before it develops a Project, it successfully markets and pre-sells at least 1/3 of the lot product to be built:  this guarantees the performance of the Company to complete the Project so that buyers can have complete confidence that what is in the "blurb" will be built.

93.  Mr. Gape's June 2005 letter stated that pre-sales were essential to Ginn's successful development of GSM:

Ginn can only be successful if it can market the Project as it does in the United States and that is by pre-sales which in its first Launch guarantee (in addition to the Hartford Bond) the full performance by the Company. This process of pre-sales in the past 10 years does attract investors who purchase lots and/or condominiums <u>before</u> construction and fully pay for them happy in the knowledge that within 1 year or 2 or 3 they can sell onward for a profit.

94. In reality, the CSCF payment terms (requiring that 100% of cash flow from GSM lot sales to be used to service the CSCF debt) prevented the initial developer of GSM from generating sufficient cash flow to support development of amenities planned and marketed for GSM.

95. The terms of the CSCF prevented GSM from incurring any additional debt. And because the CSCF leveraged GSM to the hilt, there was no remaining equity in GSM to support the development of amenities planned and marketed for GSM.

96. With no funds allocated for GSM development, 100% of cash flow from GSM lot sales obligated to debt service and a prohibition on additional debt, there was simply no money available for the development of GSM. The terms of the CSCF made development impossible.

97. In light of the CSCF, GSM lot owners, including Plaintiffs, were unknowingly investing in a development that had been looted by Lubert-Adler and ERG so those defendants could take a $333 million distribution.

98. If Lubert-Adler, Dean Adler and ERG had not facilitated the CSCF or if those defendants had not included GSM as part of the CSCF, GSM would have remained an independently capitalized development, responsible for its own debt and entitled to use its cash flow.

99. If Lubert-Adler, Dean Adler and ERG had not facilitated the CSCF or if those defendants had not included GSM as part of the CSCF, GSM lot sales from 2006 through

26

2008 (prior to the date when sales were prohibited by HUD) would have been sufficient to service the $12 million mortgage on GSM Land, to fund contractually-required infrastructure, and to begin development of the amenities that were planned and marketed for GSM.

100.    In a February 5, 2004 letter, Bahamian attorney Terence Gape assured the Bahamian Minister of Financial Services and Investments that GSM was more secure because it would be owned 100% by Ginn, rather than by multiple developer parties: "This is all very good news and will allow Ginn to have one hundred percent ownership and control of the project with no potential internal conflicts for the future."

101.    In light of the CSCF, GSM lot owners, including Plaintiffs, bore the undisclosed risk of a CSCF default and a Credit Suisse foreclosure on GSM ownership and control over future development, such that Ginn would no longer have "one hundred percent ownership and control of the project with no potential internal conflicts for the future."

## V.    Lubert-Adler Informed Advisory Boards for Lubert-Adler Funds III and IV About the Objectives and Risks of the $675 Million CSCF

102.    An April 24, 2006 draft memo of Dean Adler to Advisory Boards for Defendants LA Funds III and IV less than two months before the June 8, 2006 CSCF closing lists the goals of the CSCF including: (1) "immediate mitigation of 100% of the capital risk" and "removal of all guarantee exposure" for Defendants LA and Bobby Ginn by "paying off all existing recourse debt" and replacing it with debt that was recourse to the CSCF developments; and (2) "an immediate dividend of $333,125,000" that allows "the harvesting of profits with no risk of capital loss" and would "provide an earlier than anticipated profit distribution."

27

103.     The memo also details risks inherent in the CSCF, which requires that "the properties will all be cross-collateralized," such that "any poorly performing properties would be supported by the other properties":

> [T]he principal risk of any cross-collateralized financing is that Project A (e.g., Tesoro), though highly successful on its own, could nevertheless be lost to foreclosure in the event that Project B (e.g., Laurelmor) or Project C (e.g., Grand Bahamas-West End) do not perform well, thereby causing the Credit Suisse loan to go into default.
>
> ...
>
> If the Projects continue to be developed separately, the owner of each Project will be free to evaluate whether to invest more capital in that particular Project or let it go – solely on the merits of that particular Project. Once the Projects have become part of a cross-collateralized mortgage pool, the common owner of Project A and Project B will, to some degree, be forced to support Project A (performing poorly) in order to protect its equity in Project B (performing well).
>
> ...
>
> [T]he percentage of loan proceeds which is allocated to each Project will not be based upon a "fairness" opinion or a current fair market appraisal of each Project. Accordingly, the investors in each Project must make a determination as to whether the perceived benefits to that Project from the proposed financing will, on balance, be proportionate to the potential risks assumed by that Project.

104.     Recognizing the sharp downturn in the real estate markets in late 2005 and the first two quarters of 2006, Lubert-Adler and Dean Adler grew concerned that Lubert-Adler's investment funds would not see returns from the Ginn-LA developments. Unwilling to wait for legitimate returns from lot sales in those developments, Lubert-Adler and Dean Adler pooled five independent Ginn-LA developments, "harvested" early profits without any risk, shifted all recourse and risk for debt obligations to the CSCF developments (including GSM) and left the formerly independent developments to stand or fall as one.

**V.     Almost Immediately After Closing on the $675 Million CSCF, Bobby Ginn Was Concerned About Defaulting on the Loan**

105.     Faced with the prospect of meeting the staggering GSM lot sales projections provided to Cushman & Wakefield in order to obtain the $675 million CSCF ("Projected GSM Lot Sales"), only days after closing on the $675 million CSCF and before Plaintiffs entered into their GSM lot purchase contracts, Bobby Ginn revealed his concern that Ginn would not meet the Projected GSM Lot Sales.

106.     Shortly after the June 8, 2006 CSCF closing, there was disagreement within the Ginn organization about how to close GSM lot sales at a sufficient rate to meet the Projected GSM Lot Sales. A June 16, 2006 email from John Gantt, the head of sales for Ginn Development, reported:

> I just had the pleasure of speaking to Bobby. He asked what we are doing sales wise at Versailles at the moment. I told him that we are getting ready to bring some of the back lots on the market, exactly what I thought we all talked about in Greenville. He told me in no uncertain terms that he had instructed us to sell 110 more Ocean lots and he said he wanted it done in the next 60 days. He also said not to sell back lots until those 110 were sold. He jumped my ass over and over. Please let me know your thoughts ASAP.

107.     In a June 19, 2006 email, Myles Newell wrote to John Gantt and others, disagreeing with the suggestion from "Bobby" that the sales team only sell Ocean lots instead of other GSM lots. He indicated that the sales team would attempt to sell Ocean lots, but that they should also attempt to close sales on other GSM lots with reservation holders who would be more likely to buy the other lots (which were being offered at lower prices). He concludes:

> In summation – We have lots available for sale, we have people that want to buy them, we need to generate a large amount of revenue in a very short period of time – I do not know why we would not stay on this plan. It will not take away from trying to sell as many oceanfronts as possible. However, if we do not release any other inventory and put all our eggs in the oceanfront lots we have not fall back plan and our chance for failure rises drastically in my

opinion. John, please go over this with Bobby or set up a time for all of us to go over it with him or simply forward him my email. I will do whatever I can to keep us on this path.

## VI.   Fraudulent Concealment of the Existence and Terms of the $675 CSCF ("Initial CSCF Fraud")

108.     In order to make sufficient lot sales in GSM (as well as the other CSCF Developments) to meet the repayment obligations under the $675 million CSCF, it was essential for Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG to conceal the existence and terms of the CSCF from prospective purchasers in GSM (as well as from prospective purchasers in the other CSCF Developments).

109.     Although Lubert-Adler and Dean Adler informed the Advisory Boards for Lubert-Adler Funds III and IV about the objectives and risks of the $675 million CSCF, Lubert-Adler and Dean Adler knew it was essential to conceal the existence and terms of the CSCF from prospective GSM lot purchasers.

110.     Because the CSCF was a new loan product with extraordinarily unique terms, prospective purchasers in GSM, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, had no reason to expect that GSM was part of a $675 million credit facility that was cross-collateralized over five different Ginn-LA developments, out of which Defendants Lubert-, Dean Adler and ERG had taken a $333 million distribution.

111.     Defendants Ginn-LA West End LLLP, Lubert-Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the massive amount of the $675 million CSCF.

112.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed about the massive amount of the $675 million CSCF, those prospective purchasers would have inquired further into the terms of the CSCF.

113.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the existence and amount of the CSCF Distribution.

114.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed about the existence and amount of the CSCF Distribution, those prospective purchasers would not have purchased GSM lots.

115.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the pledge of all ownership interests in Defendant Ginn-LA West End LLLP to Credit Suisse as collateral for the CSCF ("Pledge of GSM Interests").

116.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were

informed about the Pledge of GSM Interests, those prospective purchasers would not have purchased GSM lots.

117.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the pledge of their ownership interests in the GSM Land to Credit Suisse as collateral for the CSCF ("Pledge of GSM Land").

118.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the fact that that the CSCF was partially secured by a $277 million mortgage on the GSM Land.

119.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed that the CSCF was partially secured by a $277 million mortgage on the GSM Land, those prospective purchasers would not have purchased GSM lots.

120.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the fact that CSCF loan proceeds were applied "to repay the "Existing Indebtedness" of the five CSCF Developments.

121.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed that the terms of the CSCF provided funding for five Ginn developments, not just GSM, those prospective purchasers would not have purchased GSM lots.

122.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the fact that only 2% of the Initial CSCF Disbursement went to existing indebtedness for GSM, while 64% went to the CSCF Distribution; 29% went to existing indebtedness for four Ginn developments other than GSM, and 5% went to transaction costs for the CSCF.

123.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed about how much of the CSCF went to GSM, those prospective purchasers would not have purchased GSM lots.

124.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the facts that the $675 million CSCF was to be repaid from cash flow generated by the future "projected" lot sales in all five CSCF Developments and that 58% of the

cash flow for CSCF repayment to come from future lot sales in the U.S. CSCF Developments.

125. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed that that the $675 million CSCF was to be repaid from cash flow generated by the future "projected" lot sales in all five CSCF Developments or that 58% of the cash flow for CSCF repayment to come from future lot sales in the U.S. CSCF Developments, those prospective purchasers would not have purchased GSM lots.

126. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the GSM Shortfall Obligations.

127. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed about the GSM Shortfall Obligations, those prospective purchasers would not have purchased GSM lots.

128. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed from prospective GSM purchasers, including Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the GSM Repayment Obligations.

129. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and

ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed about the GSM Repayment Obligations, those prospective purchasers would not have purchased GSM lots.

130.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed the GSM Repayment Obligations from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

131.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG knew that if prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed that the terms of the CSCF precluded any future debt on GSM assets or by Defendant Ginn-LA West End LLLP, those prospective purchasers would not have purchased GSM lots.

132.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG fraudulently concealed the fact that that the terms of the CSCF precluded any future debt on GSM assets or by Defendant Ginn-LA West End LLLP from prospective GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

**VII.    Fraudulent Concealment Concerning the 2007 Default and CSCF Restructure ("2007 CSCF Default Fraud")**

133.    In the first quarter of 2007, three months after closing on the first GSM lot sales, Defendants CSCF Borrowers defaulted on the CSCF ("2007 Initial CSCF Default").

134.    The 2007 Initial CSCF Default was not due to the underperformance of lot sales in GSM. The initial GSM developer (Ginn-LA West End Limited) closed at least 194 lot sales through 2007.

135.    The 2007 Initial CSCF Default was instead due to the underperformance of sales in other CSCF developments and particularly the Florida CSCF developments, which created a cash flow deficit that impaired the ability of the CSCF Borrowers to meet the payment obligations under the CSCF.

136.    As a result of the CSCF Initial Default, in the first quarter of 2007, Defendants CSCF Borrowers, Lubert-Adler, Lubert-Adler Fund IV and Lubert-Adler Fund V and Ginn-LA OBB entered into agreements to restructure the CSCF in order to avoid foreclosure ("2007 CSCF Restructure").

137.    The GSM resort core land included the land on which the proposed GSM casino, condominium tower and hotel, shops and restaurants, mega-yacht marina and golf club were to be constructed (collectively "GSM Resort Core").

138.    In connection with the 2007 CSCF Restructure, the initial GSM developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

139.    In connection with the 2007 CSCF Restructure, the initial developer of GSM (Ginn-LA West End Limited) on July 20, 2007 entered into an Assignment Regarding Heads of Agreement with Defendant Ginn-LA OBB that made an exclusive assignment to Defendant Ginn-LA OBB, *inter alia*, of all the rights set forth in the Head of Agreement relating to the gaming license for the GSM casino.

140.    In connection with the 2007 CSCF Restructure, the Board of Directors for the initial developer of GSM (Ginn-LA West End Limited) executed a Written Consent

("GLA BOD Written Consent") on July 20, 2007. Dean Adler signed the GLA BOD Written Consent.

141.    The GLA BOD Written Consent acknowledged that GSM had been encumbered with a mortgage as security for the $675 million CSCF and that Defendants CSCF Borrowers had defaulted under the CSCF.

142.    The GLA BOD Written Consent acknowledged that as part of the 2007 CSCF Restructure, GSM initial developer Ginn-LA West End Limited was selling the GSM Resort Core to Defendant Ginn-LA OBB.

143.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and ERG concealed the existence of the 2007 Initial CSCF Default and the terms of the 2007 CSCF Restructure from prospective purchasers in GSM and GSM lot owners, including Plaintiffs.

144.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and Ginn-LA OBB knew that if prospective GSM purchasers and GSM lot owners, including Plaintiffs, were informed about the 2007 Initial CSCF Default or that the GSM Resort Core had been sold to Defendant Ginn-LA OBB, several results would occur, including the following:

    a.   At least some GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would have inquired further into the existence and terms of the $675 million CSCF, the 2007 Initial CSCF Default and the 2007 CSCF Restructure.

    b.   At least some GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would have

discontinued making payments under GSM lot loans with Ginn Financial /Bahamas Sales.

c.  At least some GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would have considered taking legal action as a result of the Initial CSCF Fraud.

d.  Prospective purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would not have closed on their GSM lot purchases.

## VIII.  Fraudulent Concealment Concerning the 2008 Default and CSCF Restructure ("2008 CSCF Default Fraud")

145.     Notwithstanding the serious issues with cash flow and debt obligations, Bobby Ginn conducted a press tour in January 2008 to spread the word that GSM development was moving forward, that construction on 375 units was expected to begin in early summer of 2008, that construction on residential lots was expected to begin later in 2009, and that GSM would be "fully operational in our core facilities with our amenities" in five years.

146.     On June 30, 2008, Defendants CSCF Borrowers again defaulted on the CSCF by, among other things, failing to make required payments of interest, principal, and other amounts due under the Loans ("Final CSCF Default").

147.     The Final CSCF Default was not due to the underperformance of sales in GSM.  The initial GSM developer (Ginn-LA West End Limited) had its best sales month in the development's history in January 2008, in what Vice President of GSM Sales, Greg Ulmer, characterized as a "buying frenzy."

148.     The Final CSCF Default was instead due to the underperformance of sales in other CSCF developments and particularly the Florida CSCF developments, which continued to create cash flow deficits that impaired the ability of the CSCF Borrowers to meet the payment obligations under the CSCF.

149.     A Spring 2008 edition of the *Ginn Sur Mer Living* publication included a front-page article entitled, "Full Speed Ahead for Ginn sur Mer," in which Bobby Ginn offered assurances that GSM was not subject to the real estate declines seen in the United States: "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas, and we feel like this project is just hitting the market that still wants oceanfront and all of the other services that come along with it."

150.     On July 1, 2008, Ginn President Robert Gidel issued a statement concerning the Final CSCF Default ("July 1, 2008 Gidel Statement"). The July 1, 2008 Gidel Statement described the CSCF as "a non-recourse $675 million credit facility."

151.     This representation was false and misleading. While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

152.     The July 1, 2008 Gidel Statement described the CSCF as involving only four Ginn developments: Tesoro, Quail West, Laurelmor and GSM.

153.     This representation was false. The CSCF involved five Ginn developments, including one the Gidel Statement failed to acknowledge: the Hammock Beach River Club.

154. The July 1, 2008 Gidel Statement reassured GSM lot owners, "Ginn-LA West End Limited previously set up accounts which contain the funds necessary to complete the infrastructure and the initial 18-hole golf course at Ginn sur Mer. These funds are not subject to the credit facility and are unaffected by the current situation, which means there will be no disruption to the continued development of the Ginn sur Mer project or the operations and development of Old Bahama Bay."

155. This representation was false and misleading. Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

156. The July 1, 2008 Gidel Statement also reassured GSM lot owners, "The properties that are owned by Ginn-LA OBB, including the resort core of the Ginn sur Mer project, are not subject to this or any other credit facility."

157. This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the GSM initial developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

158. On August 6, 2008, Bobby Ginn appeared at a press conference to discuss the CSCF and the status of GSM development ("August 6, 2008 Bobby Ginn Statement"). The August 6, 2008 Bobby Ginn Statement was intended to reassure the general public and GSM lot owners, including Plaintiffs, that the CSCF default would not impact the development of GSM.

159. The August 6, 2008 Bobby Ginn Statement offered reassurances that, "Under the Credit Suisse loan, there were 868 lots. Two hundred of them have been sold

and released, so they are in the hands of the independent owners that bought them.  So the loan is only on the 668, and some undeveloped properties."

160.    This representation was false and misleading.  The CSCF initially included all of the GSM Land.  It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the GSM initial developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

161.    The August 6, 2008 Bobby Ginn Statement offered reassurances that "when we made that [CSCF] loan, one of the things we did is we took $124 million in cash and put it into a bankruptcy protected escrow account, for the sole purpose of finishing up development in those areas.  We took $36 million, and we put it in escrow for the completion of the first golf course."  The August 6, 2008 Bobby Ginn Statement offered additional reassurances that "we also wanted to be sure our property owners were protected, so for the people who bought the 200 lots, we put in cash, outside of the CS loan, funded by us, these escrow accounts to finish out that block of work."

162.    These representations were false and misleading.  By stating that money was in escrow to "finish up development" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that money had been set aside to complete development of the GSM marketed amenities.  In addition, Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

163.    The August 6, 2008 Bobby Ginn Statement offered reassurances that the GSM Resort Core was "[o]utside of that credit, completely unaffected by it."

164.     This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the GSM initial developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

165.     The August 6, 2008 Bobby Ginn Statement offered reassurances that the CSCF was "a non-recourse loan."

166.     This representation was false and misleading. While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

167.     The August 6, 2008 Bobby Ginn Statement offered reassurances that "If something goes wrong, and we're continuing to assume that it's not, all the money to develop all of the facilities is in place. It's there now. It's in an escrow account. You can't get any safer than that."

168.     This representation was false and misleading. By stating that money was in escrow "to develop all of the facilities" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that money had been set aside to complete development of the GSM marketed amenities.

169.     The August 6, 2008 Bobby Ginn Statement offered reassurances that, "A hundred percent of the proceeds of the loan go to pay off Credit Suisse. So they are going to be fine. This loan is going to be fine."

170.     These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a final default under the CSCF had occurred on June 30, 2008.

171.     The August 6, 2008 Bobby Ginn Statement offered reassurances that because the GSM Resort Core was outside of the CSCF, "regardless of what happens in the economy, the Grand Bahama Project is not in danger."

172.     This representation was false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a final default under the CSCF had occurred on June 30, 2008.

173.     The August 6, 2008 Bobby Ginn Statement offered reassurances that, "We never want to say something that we can't back up and we never want to sell someone something that we can't back up. We're out of business if we ever do that."

174.     This representation was false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a final default under the CSCF had occurred on June 30, 2008.

175.     As a result of the Final CSCF Default, HUD issued a directive in September 2008 "that it would administratively undertake" a suspension of the ILSA registrations filed for GSM and other CSCF Developments unless Ginn voluntarily suspended those registrations ("HUD Suspension").

176.     Ginn's lawyer filed the voluntary suspensions on September 10, 2008 for four of the CSCF Developments, including GSM, noting in an ensuing letter that the suspensions "were requested due to a default under certain credit facilities for which Credit Suisse was the agent."

177.    In October 2008, Credit Suisse notified the CS Borrower that the HUD suspension was, itself, a default under the CSCF. In addition, Credit Suisse took the position that, "[t]he Borrower's suspension of the HUD Registrations and the resulting legal prohibitions on the sale of any Residential Lots resulted in a Material Adverse Effect" causing a default under the CSCF.

178.    Following the HUD Suspension, lot sales in GSM were legally prohibited for approximately two years.

179.    On December 19, 2008, Defendants CSCF Borrowers, Ginn-LA West End LLLP, Ginn-LA OBB, Ginn West End, ERG, Lubert-Adler and Lubert-Adler Funds III, IV and V entered into agreements to again restructure development following the CSCF Final Default ("2008 Master Restructure").

180.    In connection with the 2008 Master Restructure, Defendants Ginn West End, ERG, Lubert-Adler and Lubert-Adler Fund IV (collectively "West End Pledgors") agreed that the CSCF was in final default, that the CSCF lenders would foreclose on the Pledge of GSM Interests and the Pledge of GSM Land (collectively "West End Entity Interests"), and that the West End Pledgors had no defense to the foreclosure.

181.    As a result of the Final CSCF Default, two of the United States CSCF Developments (Tesoro and Quail West), filed Chapter 7 bankruptcy proceedings on December 23, 2008.

182.    As a result of the Final CSCF Default, Ginn sold its interests in another United States CSCF Development: Laurelmor.

183.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler, ERG and Ginn-LA OBB concealed the existence and terms of the 2008 Master Restructure

44

from GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

184. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and Ginn-LA OBB fraudulently concealed the HUD Suspension from GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group.

185. Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler and Ginn-LA OBB knew that if GSM purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, were informed about the Final CSCF Default, the HUD Suspension, the existence and terms of the 2008 Master Restructure or the agreement of the West End Pledgors that they had no defense to a foreclosure on the West End Entity Interests, several results would occur, including the following:

    a. At least some GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would have inquired further into the terms of the CSCF and the restructuring following both the Initial and the Final CSCF Defaults.

    b. At least some GSM lot owners, including Plaintiffs Taliaferro, Maciag, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would have considered discontinued payments under GSM lot loans with Ginn Financial /Bahamas Sales.

    c. At least some GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, would have

considered taking legal action as a result of the Initial CSCF Fraud and the 2007

CSCF Default Fraud.

**IX.    Fraudulent Concealment Concerning the GSM Foreclosure ("GSM Foreclosure Fraud")**

186.    As a result of the Final CSCF Default, on May 22, 2009, Credit Suisse

filed an action in the Supreme Court of the State of New York to foreclose on the CSCF

Pledge of GSM ("GSM Foreclosure").

187.    In the GSM Foreclosure, Credit Suisse stated that the West End Entity

Interests consisted primarily of ownership interests in Defendant Ginn-LA West End

LLLP (the ultimate parent company of the initial developer of GSM: Ginn-LA West End

Limited) and associated rights in the property, profits and distributions of that entity.

188.    On December 23, 2009, an Order and Judgment of Foreclosure and Sale

was entered in the GSM Foreclosure ("GSM Foreclosure Judgment"), which set forth an

agreed Aggregate Indebtedness in the amount of $ 495,095,611.77.

189.    The GSM Foreclosure Judgment foreclosed Defendants Ginn West End,

ERG, CSCF Borrowers, Lubert-Adler, Ginn-LA CS Holding and others from any rights

in the West End Entity Interests and provided that such interests be sold at public auction.

190.    Credit Suisse is taking steps to obtain the required Bahamian permits to

purchase the West End Entity Interests at the public auction mandated by the GSM

Foreclosure Judgment.

191.    Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler, ERG

and Ginn-LA OBB fraudulently concealed the GSM Foreclosure from GSM lot owners,

including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer

Group and Fresonke Group.

192.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler, ERG and Ginn-LA OBB fraudulently concealed from GSM lot owners, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, the actual and potential consequences of the GSM Foreclosure on the future development of GSM. This fraudulent concealment continues to the present date.

193.     Defendants Ginn-LA West End LLLP, Lubert-Adler, Dean Adler, ERG and Ginn-LA OBB continued the Initial CSCS Fraud, the 2007 CSCF Default Fraud, the 2008 CSCF Default Fraud and the CSCF Foreclosure Fraud (collectively "CSCF Fraud") to the present and the CSCF Fraud is likely to continue in the future.

X.     **If Plaintiffs Had Known About the $675 Million CSCF, They Would Not Have Purchased GSM Lots**

194.     The initial developer of GSM (Ginn-LA West End Limited) was a subsidiary of The Ginn Companies, LLC ("Ginn"), which specializes in resort development. From its inception in 1998, Ginn established a reputation for developing successful private club and resort communities, which are differentiated from other properties by their amenities.

195.     The marketing materials for GSM described it as "a $4.9 billion world-class resort community" that would include the following components: 4,400 condominium and hotel units, centered around a 20-story "grand palace"; 1,800 single family residential homesites; two signature golf courses created by Jack Nicklaus and Arnold Palmer, with two clubhouses; a "mega-yacht marina"; a "Monte Carlo-style casino" that would be "the premier casino in the islands"; water and swim pavilions; a beach club; a world-class salon and spa; nightclubs and restaurants; "world-class shopping"; a "grand canal" connecting all resort areas; gardens, fountains and pools.

196.    The marketing materials for GSM marketed GSM as a "lifestyle" that could only have been envisioned and executed by Ginn:

> What we're creating at Ginn sur Mer in The Bahamas goes beyond that of the Grand Canal, Signature Golf Experience and even the Palace itself. What we're creating is an experience . . . A lifestyle that incorporates the sea, the setting, the architecture, the amenities, the community design, the abundance of activities and most of all the service."

197.    The marketing materials for GSM included assurances from Bobby Ginn:

> It's been a few years since we first announced plans for a new Club & Resort on Grand Bahama Island. Since then, we've envisioned and re-envisioned. We've worked very closely with the Bahamian government to develop an agreement that would benefit all those involved. The goal throughout it all was to perfect the conditions that would allow us to envision, develop and operate the largest and finest resort destination in the islands. It wasn't easy – if it was, anyone could do it – but we got there. This vision will have a major impact on The Bahamas and all of the Caribbean. The fact is, we would not have compromised the integrity of our vision, nor would we have shared any plans that we weren't 100% certain we could both develop and operate to the level you've come to expect from the Ginn Clubs & Resorts team. After reaching an agreement with the Bahamian government, we have perfected a destination of such grand pageantry and breathtaking awe, that we were compelled to name it for arguable the greatest palace ever conceived and realized…the Palace at Versailles.

198.    The marketing materials for GSM included assurances from Bobby Ginn that "Ginn sur Mer promises to offer a recreational lifestyle unparalleled by any other resort in the Caribbean and beyond."

199.    The initial developer of GSM was only contractually obligated to build the infrastructure (roads, sewer, power, water). Therefore, it was absolutely critical for prospective purchasers to evaluate the ability of the developer to deliver on the amenities described in the GSM marketing materials, which the initial GSM developer was not contractually obligated to build ("GSM Marketed Amenities").

200.    In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of

any circumstances that might call into doubt Bobby Ginn's assurance that Ginn was "100% certain" it could develop and operate everything that was marketed.

201. In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might affect the timing of the development of GSM, including the GSM Marketed Amenities.

202. In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might interfere with the initial developer's control over the development and operation of GSM, including the GSM Marketed Amenities.

203. In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities, it was essential that prospective purchasers be informed of any circumstances that might interfere with the initial developer's ownership of the GSM Land.

204. In order to evaluate the ability of the initial GSM developer to deliver on the GSM Marketed Amenities as well as facts that might interfere with Plaintiffs' future use and enjoyment of their lots, it was essential that prospective purchasers be informed of any circumstances that might result in a transfer of the ownership in the initial GSM developer company.

205. If prospective purchasers, including Plaintiffs Taliaferro, Maciag, Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group, had been informed about the existence and terms of the CSCF, as outlined above, they would not have agreed to purchase GSM lots.

**XI.**   **Plaintiffs Were Immediately Damaged by the CSCF Fraud When They Closed on Their GSM Lot Purchases**

206.      Plaintiffs did not discover the Credit Suisse Fraud, or that Defendants Lubert-Adler, Dean Adler and ERG had fraudulently concealed that scheme, until on or after July 2008 when Ginn President Robert Gidel announced the CSCF default and August 6, 2008 when Bobby Ginn announced the June 30, 2008 CSCF Final Default in a video press conference.

207.      The existence of the $675 million CSCF, and the risks it posed to the development, use and control of GSM, were material to Plaintiffs' decision whether to purchase GSM lots.

208.      Defendants Lubert-Adler, Dean Adler, Ginn-LA OBB and ERG received a direct benefit from the Credit Suisse Fraud.

209.      The Credit Suisse Fraud damaged Plaintiffs because the terms of the CSCF made it impossible for Plaintiffs to receive the benefits of the amenities that were marketed for GSM.  But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

210.      The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development that was liable for a $675 million loan that was used to fund the development of other Ginn Communities owned by purportedly independent Ginn Project Partnerships.  But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

211.      The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a

development that was liable for a $675 million loan that was used to provide a $333 million distribution to Defendants Lubert-Adler and ERG. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

212.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development that was liable for a $675 million loan that could go into default and foreclosure if the sales in four other Ginn United States developments did not meet sales projections. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

213.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development where the ownership interests in the Project Partnership that owned the development had been pledged as collateral for a $675 million loan. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

214.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in a development where the land for the development was mortgaged for $276,750,000 million of the CSCF, even though GSM did not receive that amount from the CSCF. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

215.    The Credit Suisse Fraud damaged Plaintiffs because at the moment Plaintiffs closed on their GSM lot purchases, Plaintiffs had unwittingly invested in lots that were (at the time of closing) worth far less than Plaintiffs paid for those lots. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

216. Plaintiffs were damaged in the amounts they have paid for their lots because they would not have closed on their GSM lot purchases if they had known about the Credit Suisse Fraud. But for the Credit Suisse Fraud, Plaintiffs would not have suffered these damages.

217. But for the Credit Suisse Fraud, Plaintiffs would not have transferred funds in payment of down payments and mortgage payments in connection with the purchase of GSM lots.

218. Plaintiffs were each damaged in an amount that includes the amounts paid as a down payment, cash paid at closing, interest paid at closing, tax stamps, loan fees, property taxes paid to date, mortgage payments to date, property taxes still owed and mortgage amounts still owed. The exact amount of each Plaintiff's damages will be proven at trial.

219. The 2007 CSCF Default Fraud damaged Plaintiffs because Plaintiffs would have discontinued making payments under their GSM lot loans if they had known about the 2007 CSCF Default Fraud.

220. The 2007 CSCF Default Fraud damaged Plaintiffs because Plaintiffs would have instituted legal action in 2007 to recover their damages if they had known about the 2007 CSCF Default Fraud.

221. The 2008 CSCF Default Fraud damaged Plaintiffs Taliaferro, Maciag, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group because those Plaintiffs would have discontinued making payments under their GSM lot loans if they had known about the 2008 CSCF Default Fraud.

222.     The 2008 CSCF Default Fraud damaged Plaintiffs Taliaferro, Maciag,

Smith, Clemmons Group, Carell Group, Hoyer Group and Fresonke Group because those

Plaintiffs would have instituted legal action in 2008 to recover their damages if they had

known about the 2008 CSCF Default Fraud.

## FACTUAL BACKGROUND:  Ginn Financial Fraud

### XII.   June 2006 to August 2006:  Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn Obtained Underlying Funding for GSM Mortgage Loans

223.     Defendant Bobby Ginn caused Defendant Ginn Financial to be formed in

June 2005.  Defendant Ginn Financial became a licensed mortgage lender in the State of

Florida on October 4, 2005.

224.     From approximately June 2005 through October 2006, Defendants Lubert-

Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn directed Defendant Ginn

Financial to obtain underlying funding in order to offer mortgage loans to GSM lot

purchasers.

225.     On or before October 2006, Defendants Lubert-Adler, Lubert-Adler Fund

IV, Dean Adler, Ginn Financial and Bobby Ginn negotiated a credit line from

CapitalSource International, Inc. ("CapitalSource Credit Line"), which credit line would

be used to fund mortgage loans offered to GSM lot purchasers.

226.     On August 4, 2006 Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean

Adler and Bobby Ginn formed Defendant Bahamas Sales as a single purpose entity to

serve as the lender on those GSM mortgage loans funded by the CapitalSource credit

line.

227.     On October 31, 2006, Defendants Lubert-Adler, Lubert-Adler Fund IV,

Dean Adler, Ginn Financial and Bobby Ginn caused Defendant Bahamas Sales to enter

into a "Receivables Loan and Security Agreement" with Capital Source ("CapitalSource

Loan Agreement") pursuant to which Bahamas Sales obtained the Capital Source Credit

Line.

XIII.   **June 2006: Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler
        and Bobby Ginn Caused Defendant Ginn Financial to Offer Mortgage
        Financing to Prospective GSM Lot Purchasers**

228.     Beginning in Fall 2006, Defendants Lubert-Adler, Lubert-Adler Fund IV,

Dean Adler and Bobby Ginn directed Defendant Ginn Financial to recommend to

prospective GSM lot purchasers, including Plaintiffs Taliaferro, Maciag, Clemmons

Group, Carell Group, Hoyer Group and Fresonke Group, that they could obtain mortgage

financing for GSM lot purchases through Ginn Financial.

229.     Plaintiffs Todd Taliaferro and Maureen Taliaferro; Arthur and Alexandria

Maciag; Ricky Clemmons; James Carell; Thomas and Caroline Hoyer; and Dean

Fresonke, Stephanie Fresonke, David Garner, Stephen Tormey, Denise Tormey, Tom

Harvey and Sandra Harvey ("Mortgagor Plaintiffs") undertook the mortgage loan

application process for GSM mortgage loans with loan officers purporting to represent

Ginn Financial.

230.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby

Ginn directed Defendant Ginn Financial to provide applications to Mortgagor Plaintiffs,

order appraisals for GSM lots being purchased by Mortgagor Plaintiffs, underwrite and

approve applications for Mortgagor Plaintiffs' GSM loans, and provide Mortgagor

Plaintiffs with federally mandated mortgage loan disclosures.

231.     From around August 2006 through 2007, Defendants Lubert-Adler,

Lubert-Adler Fund IV, Dean Adler and Bobby Ginn directed Ginn Financial to send

Mortgagor Plaintiffs a variety of loan documents, all of which stated that Ginn Financial was the lender for Mortgagor Plaintiffs' GSM loans.

**XIV.   Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bobby Ginn, Ginn Financial and Bahamas Sales Reassured GSM Mortgagors That GSM Mortgage Loans Offered Protections That Were Customary For Mortgage Loans in the United States**

232.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler Ginn Financial, Bahamas Sales, Ginn Title and Bobby Ginn took the following steps to reassure Mortgagor Plaintiffs that even though they were purchasing land located in the Bahamas, the mortgage financing for GSM lots would offer protections that are customary for mortgage financing of real property in the United States:

   a.   Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that it was offering specialized loan programs for GSM lot purchasers.

   b.   Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that it was the preferred lender for GSM lot purchasers.

   c.   Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that it was a licensed mortgage lender in the State of Florida.

   d.   Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that it would guide them through the process of obtaining a mortgage loan on GSM lots, which were located in the Bahamas.

e.  Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that by obtaining "in-house" mortgage financing of their GSM lots, they could expedite the closing process for their lot purchases.

f.  Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that it would offer 80% loan-to-value mortgage loans on GSM lots, whereas Bahamian banks would only offer mortgage loans at approximately 50% loan-to-value.

g.  Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial to represent to Mortgagor Plaintiffs that it was requiring Mortgagor Plaintiffs to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

h.  Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial, Bahamas Sales and Ginn Title to offer GSM lot purchasers, including Plaintiffs, the option to execute closing documents for their GSM mortgage loans in the United States, without travelling to the Bahamas:

   i.  For some lot closings (collectively, "GSM Delivered Closings"), Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial, Ginn Title, Bahamas Sales and Bobby Ginn caused representatives to fly to various locations throughout the United States, as designated by the GSM lot purchaser, in order for the purchaser to execute GSM mortgage closing

documents.  Ginn representatives personally delivered mortgage closing

documents for the following Mortgagor Plaintiffs:  Hoyer.

ii.    For other lot purchases (collectively, "GSM FedEx Closings"), Defendants

Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial, Ginn

Title, Bahamas Sales and Bobby Ginn caused Ginn representatives to send

mortgage closing documents to GSM lot purchasers for their signatures via

Federal Express.  Mortgage closing documents were delivered via FedEx for

the following Mortgagor Plaintiffs:  Taliaferro, Maciag, Fresonke,

Clemmons, Carell.

**XIII.   December 2006 to March 2007:  Defendants Lubert-Adler, Lubert-Adler
Fund IV, Dean Adler and Bobby Ginn Caused Mortgagor Plaintiffs' GSM
Loans to Close with Bahamas Sales as the Lender Instead of Ginn Financial**

233.    Ginn Financial did not actually close on Mortgagor Plaintiffs' GSM loans.

234.    Instead, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and

Bobby Ginn formed Defendant Bahamas Sales as a single purpose entity in August 2006

for the purpose of serving as the lender on GSM mortgage loans funded by the Capital

Source Credit Line, including Mortgagor Plaintiffs' GSM loans.

235.    Even though Bahamas Sales closed on Mortgagor Plaintiffs' GSM loans,

Bahamas Sales was not a licensed mortgage lender, correspondent mortgage lender or

mortgage broker in any state.

**XIII.   Defendants Lubert-Adler and Lubert-Adler Fund IV Had A Financial
Interest In GSM Mortgage Loans**

236.    There were approximately 215 GSM lots sold.  Of the GSM lots sold,

approximately 50% were cash buyers, and the others were financed in one of three ways.

237.     The majority of the GSM lots that were financed were financed through Ginn Financial's mortgage division, with Bahamas Sales as the lender ("BSA Mortgage Loans"). The BSA Mortgage Loans were offered for 80 percent loan-to-value. CapitalSource provided financing for 64 percent of the purchase price, and Lubert-Adler provided financing for 16 percent of the purchase price, totaling the 80 percent financing. Mortgagor Plaintiffs' GSM Loans fell into this category.

238.     Ten or fewer of the GSM lots that were financed, where mortgagors did not satisfy the underwriting requirements of CapitalSource, were financed through Ginn Financial, with Lubert-Adler providing the underlying funding ("GFS Mortgage Loans"). These loans were generally financed at a loan-to-value ratio of less than 80 percent.

239.     Six or seven of the GSM lots that were financed, were financed through Bahamian banks. For these loans, Ginn Financial provided a second mortgage on approximately 3, with Lubert-Adler providing the underlying funding ("GFS Second Mortgage Loans").

240.     Defendants Lubert-Adler and Lubert-Adler Fund IV had a financial interest in all but approximately 3-4 of the GSM lots that were financed:

a.   Lubert-Adler and Lubert-Adler Fund IV had a financial interest in the BSA Mortgage Loans, by virtue of the fact that Lubert-Adler (through Lubert-Adler Fund IV) provided financing for 16 percent of the purchase price on such loans. In addition, Lubert-Adler agreed with CapitalSource that if any BSA Mortgage Loans were 60-days delinquent, Lubert-Adler would be automatically required to "buy back" or pay off the balance of those delinquent loans.

b. Lubert-Adler and Lubert-Adler Fund IV had a financial interest in the GFS
Mortgage Loans and the GFS Second Mortgage Loans, by virtue of the fact that
Lubert-Adler (through Fund IV) provided the funding for such loans.

c. Lubert-Adler and Lubert-Adler Fund IV held an equity interest in Bahamas
Sales.

## XIV. October 2006: Ginn Financial Attempted to Influence Pomeroy Appraisal to Provide Fraudulently Inflated Appraisals for GSM Lots

241. Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby
Ginn caused Ginn Financial to suborn the preparation of fraudulently inflated appraisals
as part of the underwriting process for Mortgagor Plaintiffs' GSM mortgage loans.

242. In Fall 2006, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean
Adler and Bobby Ginn caused Defendant Ginn Financial to retain Pomeroy Appraisal
Associates ("Pomeroy") to provide appraisals for GSM lots.

243. Ginn Financial provided Pomeroy with numerous Request for Appraisal
Forms. Each Request for Appraisal included a sales price for the subject lot and several
included an "Estimated Value" figure.

244. Ginn Financial informed Pomeroy the lot sales price was the target value
for Pomeroy's appraisals.

245. Although Pomeroy informed Ginn Financial that GSM lot prices were
significantly higher than sales prices for comparable lots outside of GSM, and that any
U.S. lender would want to see an appraisal based on comparable lot sales on Grand
Bahama Island but outside GSM, Ginn Financial pressured Pomeroy to consider GSM
sales as the only comparables for its GSM lot appraisals.

246.    Pomeroy informed Ginn Financial that its appraisals must state they were "subject to" completion of infrastructure and amenities Ginn was marketing for GSM. In response, Ginn Financial asked Pomeroy to provide a rough draft of its appraisals for several GSM lots, and Pomeroy provided drafts.

247.    After reviewing Pomeroy's draft appraisals, Ginn Financial asked Pomeroy to remove the "subject to" comments from the drafts. Pomeroy refused. In response, Ginn Financial fired Pomeroy. Ginn Financial informed Pomeroy that Ginn Financial's "investors" would not accept a "subject to" valuation.

248.    Subsequent to firing Pomeroy, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial and Bahamas Sales retained an appraiser in the Bahamas, W. Carver Grant & Co. LTD, to provide appraisals of GSM lots financed under the BSA Mortgage Loans, the GFS Mortgage Loans and the GFS Second Mortgage Loans (collectively "Lubert-Adler funded GSM Mortgage Loans").

249.    The Carver Grant appraisals for GSM lots included value for nonexistent infrastructure and amenities, failed to state the appraised values were "subject to" completion of infrastructure and amenities, failed to include any justification for the appraised value and failed to comply with the Uniform Standards of Professional Appraisal Practice ("USPAP").

250.    Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Ginn Financial and Bahamas Sales to utilize inflated and unsupported appraisals that did not comply with USPAP in order to justify the sale and financing of Mortgagor Plaintiffs' GSM lots at inflated prices based on infrastructure and amenities that did not exist.

251.    The true market value of GSM lots, without including any value for nonexistent infrastructure and amenities, was hundreds of thousands of dollars less than the Carver Grant appraised values for GSM lots.

252.    Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn directed Ginn Financial and Bahamas Sales to ensure that Lubert-Adler funded GSM Mortgage Loans were approved and that Ginn Title disbursed mortgage loan funds at the closing of financed GSM lot sales, notwithstanding their knowledge of the fact that the Carver Grant appraisals were fraudulently inflated and based upon infrastructure and amenities that did not exist.

253.    Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn directed Ginn Financial and Bahamas Sales to rely on the fraudulently inflated Carver Grant appraisals because:

 a. Lubert-Adler and Dean Adler, as part of the CSCF Fraud and in concert with the CSCF Defendants, provided Cushman & Wakefield in early 2006 with projected lot sales for GSM.

 b. The GSM projected lot sales provided to Cushman & Wakefield were based on lot prices established for GSM lots. The GSM lot prices were inflated and unsupported by any market value appraisal.

 c. In order for Lubert-Adler and the CSCF Defendants to service the CSCF debt, it was necessary to actually sell GSM lots at prices equal to or greater than the projected lot prices provided to Cushman & Wakefield.

 d. Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn could not permit "subject to" GSM lot appraisals that complied with USPAP because

Lubert-Adler and Dean Adler knew the terms of the $675 million CSCF would prevent the development of amenities that were marketed for GSM.

e. It was necessary for Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn to find an appraiser to provide GSM lot appraisals that included value for nonexistent infrastructure and amenities without making the appraised value subject to their completion.

## XV.  Mortgagor Plaintiffs Were Damaged by the Appraisal Fraud Scheme

254.    Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Ginn Title and Bahamas Sales fraudulently concealed their scheme to utilize fraudulently inflated appraisals in support of Lubert-Adler funded GSM Mortgage Loans and in order to justify inflated prices for all GSM lots

255.    Mortgagor Plaintiffs did not discover the Appraisal Fraud Scheme, or that Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial, Ginn Title and Bahamas Sales had fraudulently concealed that scheme, until 2010.

256.    The appraised value of GSM lots, set forth in Carver Grant Appraisals, was or should have been material to the underwriting decisions whether to approve Lubert-Adler funded GSM Mortgage Loans.

257.    Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Bahamas Sales, and Ginn Title all received a direct benefit from the Appraisal Fraud Scheme.

258.    In the course of underwriting, approving and issuing financing for Lubert-Adler funded GSM Mortgage Loans, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Ginn Title and Bahamas Sales had a duty to ensure the

GSM lot appraisals supporting such loans were accurate and conducted in compliance with the USPAP.

259.     In the course of underwriting, approving and issuing financing for Lubert-Adler funded GSM Mortgage Loans, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Bahamas Sales, and Ginn Title had a further duty to act in good faith and with fair dealing.

260.     As a result, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Bahamas Sales, and Ginn Title had a duty not to suborn mischaracterization of the appraised value of any GSM lot securing a Lubert-Adler funded GSM Mortgage Loan.

261.     Mortgagor Plaintiffs had a right to rely and did rely on Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Bahamas Sales, and Ginn Title to meet the duties outlined in Paragraphs 258-260.

262.     But for the Appraisal Fraud Scheme perpetrated by Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn, Ginn Financial, Bahamas Sales, and Ginn Title, Mortgagor Plaintiffs would not have closed on their GSM mortgage loans.

263.     But for the Appraisal Fraud Scheme, Plaintiffs would not have purchased GSM lots or would not have purchased GSM lots at fraudulently inflated prices.

264.     But for the Appraisal Fraud Scheme, Mortgagor Plaintiffs' GSM mortgage loans should not have been approved for the fraudulently inflated sales prices.

265.     The Appraisal Fraud Scheme damaged Plaintiffs:

a. At the moment Mortgagor Plaintiffs closed on their GSM mortgage loans, they were saddled with mortgage loans with a debt to equity ratio far in excess of

    100% because those loans were made for amounts far in excess of the market value of the lots at the time of closing.

b.   At the moment Mortgagor Plaintiffs closed on their GSM mortgage loans, the interest on their GSM Mortgage Notes began to accrue based on the fraudulently inflated purchase prices for those lots.

c.   At the moment all Plaintiffs closed on their GSM lot purchases, they were saddled with lots for which they had grossly overpaid.

d.   At the moment all Plaintiffs closed on their GSM lot purchases, the amount of property taxes on their GSM lots began to accrue based upon the fraudulently inflated purchase prices for those lots. The Bahamian government continues to calculate Plaintiffs' property taxes based on the fraudulently inflated purchase prices.

e.   At the moment all Plaintiffs closed on their GSM lot purchases, they were saddled with lots that were virtually unmarketable except at prices significantly below the fraudulently inflated purchase prices.

## RICO Allegations

### The Enterprise: CSCF Enterprise

266.    Plaintiffs and Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler Fund IV, Lubert-Adler Fund V, Dean Adler, ERG, Ginn West End, Ginn-LA West End LLLP, Ginn-LA CS Borrower, Ginn-LA Conduit Lender, Ginn-LA OBB and Ginn-LA CS Holding are all "persons" within the meaning of 18 U.S.C. § 1961(3).

267.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiffs refer to as the "CSCF Enterprise": (1) Defendant Lubert-Adler; (2) Lubert-Adler Fund III; (3) Lubert-Adler

64

Fund IV; (4) Lubert-Adler Fund V; (5) Dean Adler; (6) Defendant Ginn West End; (7)

Defendant Ginn-LA West End LLLP; (8) Defendant Ginn-LA CS Borrower; (9)

Defendant Ginn-LA Conduit Lender; (10) Defendant Ginn-LA OBB; (11) Defendant

ERG; (12) Defendant Ginn-LA CS Holding and (13) other persons presently unknown to

Plaintiffs (collectively "CSCF Defendants").

268.     The CSCF Enterprise is an ongoing organization that engages in, and

which activities affect, interstate and foreign commerce. At all time relevant to the

allegations herein, the CSCF Defendants did knowingly and willfully make use of the

means and instruments of transportation and communications of interstate and foreign

commerce to communicate with one another, with Credit Suisse; with Cushman &

Wakefield, with Standard & Poor's, with prospective purchasers of lots in GSM, with

plaintiffs and with the general public.

269.     Although the CSCF Defendants participate in and are members and part of the

CSCF Enterprise, each the CSCF Defendants also has an existence separate and apart from the

CSCF Enterprise.

270.     At all relevant times, the CSCF Enterprise has had an ascertainable structure

separate and apart from the pattern of racketeering activity in which the CSCF Defendants

have engaged and their conspiracy to engage in such activity. The primary decision-makers

for the CSCF Enterprise are Bobby Ginn and Dean Adler, as well as Defendants Lubert-

Adler and ERG, who directed and continue to direct the activities of the CSCF Enterprise.

271.     The CSCF Defendants control and operate the CSCF Enterprise through a

variety of means including, but not limited to, the following:

a.  by investing funds to develop GSM;

b. by agreeing to create and creating Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender in order to secure the CSCF;

c. by providing speculative, unreasonable and unsupported CSCF Project Projections to GSM in support of the TNV "appraisal" necessary to obtain the CSCF;

d. by amending the Heads of Agreement with the Bahamian government to include 1020 additional GSM residential lots and 500 additional GSM condominiums necessary to match the CSCF Project Projections provided to GSM;

e. by secretly securing the CSCF;

f. by secretly providing a $333 million distribution to Defendants Lubert-Adler and ERG from the CSCF;

g. by secretly authorizing the use of the vast majority of the remaining proceeds from the CSCF for the development of subdivisions other than GSM;

h. by collateralizing the $675 million CSCF across five CSCF Developments;

i. by pledging the GSM land as security for the CSCF;

j. by pledging the ownership interests in Defendants Ginn-LA West End LLLP and Ginn West End as security for the CSCF;

k. by concealing the existence and terms of the $675 million CSCF from prospective and actual purchasers in GSM, including Plaintiffs;

l. by concealing the 2007 Initial CSCF Default from prospective and actual purchasers in GSM, including Plaintiffs;

m. by concealing the existence and terms of the 2007 CSCF Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

n. by concealing the impact of the 2007 CSCF Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

o. by concealing the HUD Suspension from prospective and actual purchasers in GSM, including Plaintiffs;

p. by authorizing fraudulent and misleading statements about the Final CSCF Default to plaintiffs and the general public;

q. by concealing the existence and terms of the 2008 Master Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

r. by concealing the impact of the Final CSCF Default and 2008 Master Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

s. by concealing the GSM Foreclosure from prospective and actual purchasers in GSM, including Plaintiffs;

t. by concealing the impact of the GSM Foreclosure and 2008 Master Restructure from prospective and actual purchasers in GSM, including Plaintiffs;

u. by agreeing to conceal and concealing their fraudulent scheme to engage in the CSCF Fraud.

272.     The CSCF Enterprise has pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud Plaintiffs and to collect profits from the fraudulent, misleading and unlawful actions of the CSCF Enterprise.  Those actions began before Plaintiffs purchased their GSM lots, continue to the present and threaten to continue into the future.

273.     The formation, existence and actions of the CSCF Enterprise were and are essential to the success of its fraudulent, misleading and unlawful actions.

## Predicate Acts- Mail, Wire and Bank Fraud: CSCF Enterprise

274.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud). CSCF Defendants have engaged and continue to engage in conduct violating each of these laws in an effort to effectuate the CSCF Fraud.

275.     For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, CSCF Defendants in violation of 18 U.S.C. § 1341 and 1343 caused matter and things to be delivered by the Postal Service or by private or commercial interstate carriers. These acts were done intentionally and knowingly with the specific intent to advance CSCF Defendants' schemes, or with knowledge that the use of mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

276.     CSCF Defendants carried out their scheme in different states within the United States and in other countries and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

277.     The matter and things sent by CSCF Defendants via the Postal Service or private or commercial carrier, wire or other interstate media include, but are not limited to, the following. To the extent that details concerning the exact dates of and persons involved in sending the following matters or things are not alleged herein, such details are in the exclusive control of one or more of the CSCF Defendants, and/or other persons

presently unknown to Plaintiffs:

    a. Throughout 2006, Lubert-Adler, Dean Adler and ERG authorized and caused marketing materials to be sent to the general public and prospective GSM purchasers, including Plaintiffs, via the Postal Service or private or commercial carrier, wire or other interstate media.

        i. The marketing materials for GSM described it as "a $4.9 billion world-class resort community" that would include the following components: 4,400 condominium and hotel units, centered around a 20-story "grand palace"; 1,800 single family residential homesites; two signature golf courses created by Jack Nicklaus and Arnold Palmer, with two clubhouses; a "mega-yacht marina"; a "Monte Carlo-style casino" that would be "the premier casino in the islands"; water and swim pavilions; a beach club; a world-class salon and spa; nightclubs and restaurants; "world-class shopping"; a "grand canal" connecting all resort areas; gardens, fountains and pools.  These representations were false and misleading because Defendants Lubert-Adler, Dean Adler and ERG knew that the terms of the CSCF would prevent the development of GSM to include these marketed amenities.

        ii. Marketing materials for GSM included assurances from Bobby Ginn: "The fact is, we would not have compromised the integrity of our vision, nor would we have shared any plans that we weren't 100% certain we could both develop and operate to the level you've come to expect from the Ginn Clubs & Resorts team."  This representation was false and misleading because

Defendants Lubert-Adler, Dean Adler and ERG knew the terms of the CSCF would prevent the development of GSM to include the marketed amenities.

b. On or about March 30, 2006, Defendant Ginn-LA LLLP (through the signature of Robert Masters) executed an engagement letter with Credit Suisse for Senior Secured Credit Facilities up to $800 million, which engagement letter was sent to Credit Suisse and received from Credit Suisse via the Postal Service or private or commercial carrier, wire or other interstate media.

c. On dates presently unknown to Plaintiffs but before March 31, 2006, Defendants Lubert-, Dean Adler, ERG, Ginn-LA CS Borrower and Ginn-LA Conduit Lender sent communications to Cushman & Wakefield via the Postal Service or private or commercial carrier, wire or other interstate media in the form of the CSCF Project Projections and other related information relating to the projections of future lot sales in the CSCF Developments. This information was speculative, overstated and unsupported by historical information. This information was intended to cause Cushman & Wakefield to issue TNV "appraisals" for each of the CSCF Developments in amounts that would justify the $675 million CSCF.

d. On or about April 18, 2006, Defendants Lubert-Adler and ERG caused information to be sent to the Delaware Department of State, Division of Corporations via the Postal Service or private or commercial carrier, wire or other interstate media for the formation of Defendant Ginn-LA CS Borrower. Defendant Ginn-LA CS Borrower was formed for the sole purpose of acting as a borrower under the CSCF.

e. On or about April 24, 2006 Dean Adler prepared a draft memo to the Advisory Boards for Lubert-Adler Funds III and IV summarizing the goals and risks of the CSCF.  Defendant Adler knew the draft memo would be transmitted to others at Lubert-Adler and Ginn via the Postal Service or private or commercial carrier, wire or other interstate media.

f. On or about May 5, 2006, Defendants Lubert-Adler and ERG caused information to be sent to the Delaware Department of State, Division of Corporations via the Postal Service or private or commercial carrier, wire or other interstate media for the formation of Defendant Ginn-LA Conduit Lender.  Defendant Ginn-LA Conduit Lender was formed for the sole purpose of acting as a borrower under the CSCF.

g. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA CS Borrower and Ginn-LA Conduit Lender sent communications to Credit Suisse Securities (USA) LLC via the Postal Service or private or commercial carrier, wire or other interstate media authorizing Credit Suisse to act as sole arranger for the CSCF.

h. On or about May 10, 2006, Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender (through the signatures of Chairman, CEO and President Bobby Ginn), sent to Credit Suisse Securities (USA) LLC via the Postal Service or private or commercial carrier, wire or other interstate media a Company Authorization letter that was intended to be included in a Confidential Information Memorandum on the CSCF.

i.  On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused information to be sent to Credit Suisse Securities (USA) LLC via the Postal Service or private or commercial carrier, wire or other interstate media, for purposes of inclusion in a Confidential Information Memorandum on the CSCF. Such information included but was not limited to Property Overviews for each of the CSCF Developments; background information on Defendant Lubert-Adler and its prior investment in Ginn developments; background information on The Ginn Companies and their prior developments; financial information on the sources and uses of the CSCF; a debt repayment summary; and information on the legal structure and ownership of the entities involved in the CSCF, including Defendants Lubert-Adler, ERG, Ginn West End, Ginn-LA Conduit Lender, Ginn-LA CS Borrower, and Ginn-LA West End LLLP, as well as the individual partnerships acting as the developers for the CSCF Developments.

j.  On or about May 10, 2006 Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender requested that the Confidential Information Memorandum be distributed "to such financial institutions as you may deem appropriate to include in the Credit Facilities," with knowledge that the Confidential Information Memorandum would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media.

k.  On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused Powers of Attorney for the purchase of GSM lots to be sent to prospective GSM purchasers

via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended to induce prospective purchasers to execute the Powers of Attorney and submit $50,000 deposits for GSM lots without informing any prospective purchasers about the $675 million CSCF. These Defendants intended to utilize the executed Powers of Attorney and $50,000 deposits to submit to Credit Suisse as evidence of impending lot sales in GSM as part of these Defendants' efforts to obtain the CSCF.

l. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP did receive executed Powers of Attorney for the purchase of GSM lots, along with $50,000 deposits, from prospective GSM purchasers via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended to utilize the executed Powers of Attorney and $50,000 deposits to submit to Credit Suisse as evidence of impending lot sales in GSM as part of these Defendants' efforts to obtain the CSCF.

m. On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused marketing and other communications to be sent to prospective GSM purchasers via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants used such communications to induce prospective purchasers to execute reservation agreements for GSM lots and to pay $1,000-$2,000 deposits to secure such lot reservations without informing any prospective purchasers about the $675 million CSCF. These Defendants intended to utilize the lot

reservation agreements and deposits to submit to Credit Suisse as evidence of
impending lot sales in GSM as part of these Defendants' efforts to obtain the
CSCF.

n.  On dates presently unknown to Plaintiffs but before May 10, 2006, Defendants
Lubert-Adle, Dean Adler r, ERG and Ginn-LA West End LLLP did receive
executed GSM lot reservation agreements, along with $1,000-$2,000 deposits,
from prospective GSM purchasers via the Postal Service or private or
commercial carrier, wire or other interstate media.  These Defendants intended to
utilize the lot reservation agreements and deposits to submit to Credit Suisse as
evidence of impending lot sales in GSM as part of these Defendants' efforts to
obtain the CSCF.

o.  On dates presently unknown to Plaintiffs but before May 16, 2006, Defendants
Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial
and other information on the terms of the CSCF and on Defendants Ginn-LA CS
Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard
& Poor's via the Postal Service or private or commercial carrier, wire or other
interstate media.  Those Defendants intended this information to induce Standard
& Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and
Ginn-LA Conduit Lender that would support the issuance of the CSCF.  Those
Defendants provided this information to Standard & Poor's with knowledge that
it would be used for ratings statements that would be transmitted via the Postal
Service or private or commercial carrier, wire or other interstate media to Credit

Suisse, to other parties involved in the CSCF, and to Standard & Poor's
subscribers.

p. On or about May 16, 2006, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-
LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender
received from Standard & Poor's via the Postal Service or private or commercial
carrier, wire or other interstate media, a document entitled "Research Update:
Issuer Credit, Bank Loan Ratings Assigned to Ginn-LA CS Borrower and Ginn-
LA Conduit Lender."

q. On or about May 22, 2006 Dean Adler prepared another version of the draft
memo to the Advisory Boards for Lubert-Adler Funds III and IV summarizing
the goals and risks of the CSCF. Defendant Adler knew the draft memo would
be transmitted to others at Lubert-Adler and Ginn via the Postal Service or
private or commercial carrier, wire or other interstate media.

r. On or about June 2, 2006 Dean Adler prepared a final memo to the Advisory
Boards for Lubert-Adler Funds III and IV summarizing the goals and risks of the
CSCF. Defendant Adler knew the final memo would be transmitted to the
Advisory Boards and to others at Lubert-Adler and Ginn via the Postal Service or
private or commercial carrier, wire or other interstate media.

s. On June 8, 2006, Defendants Lubert-Adler, Dean Adler and ERG caused the
initial developer of GSM (Ginn-LA West End Limited) to execute an
Amendment to the Heads of Agreement with the Bahamian government, with
knowledge that it would be transmitted via the Postal Service or private or
commercial carrier, wire or other interstate media to other signatories of the

agreement for execution in counterparts. This Amendment to the Heads of
Agreement increased the number of residential lots from 870 to 1,890 and the
number of condominium units from 4,400 to 4,900 in order to match the CSCF
Project Projections provided to GSM.

t. On June 8, 2006, Defendants Lubert-Adler, Dean Adler and ERG caused
Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute a
$525 Million Senior First Lien Credit Facility with Credit Suisse, Cayman
Islands Branch and Credit Suisse Securities (USA) LLC, with knowledge that it
would be transmitted via the Postal Service or private or commercial carrier, wire
or other interstate media to other signatories of the agreement for execution in
counterparts.

u. On June 8, 2006, Defendants Lubert-Adler, Dean Adler and ERG caused
Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute a
$150 Million Senior Second Lien Credit Facility with Credit Suisse, Cayman
Islands Branch and Credit Suisse Securities (USA) LLC, with knowledge that it
would be transmitted via the Postal Service or private or commercial carrier, wire
or other interstate media to other signatories of the agreement for execution in
counterparts.

v. On June 8, 2006, Defendants Lubert-Adler, Dean Adler and ERG caused
Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to execute a
Disbursement Authorization letter sent to Credit Suisse Cayman Islands via the
Postal Service or private or commercial carrier, wire or other interstate media.
The Disbursement Authorization instructed and authorized Credit Suisse to

disburse a total of $510 million via wire to several different banks in the United

States, the Bahamas and the Caribbean.  The Disbursement Authorization

authorized, among other payments, the $333 million distribution to Defendants

Lubert-Adler and ERG, and payments of the project expenses of CSCF

Developments other than GSM.  Of the $510 million covered by the

Disbursement Authorization, only 2% was authorized to pay the existing

indebtedness of GSM.

w.  On June 8, 2006, Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler

Fund IV, Dean Adler, Ginn-LA CS Holding and ERG caused Defendants Ginn

West End to execute a Pledge Agreement and Limited Recourse Guaranty (First

Lien) on behalf of Defendant Ginn-LA West End LLLP, with knowledge that it

would be transmitted via the Postal Service or private or commercial carrier, wire

or other interstate media to other signatories of the agreement for execution in

counterparts. With the Pledge Agreement, Defendant Ginn-LA West End LLLP

guaranteed the obligations under the $675 million CSCF by a pledge of 65% of

its interests in Ginn-LA International Business Company, Ltd. and 100% of its

interests as the sole owner of Defendant Ginn-LA Conduit Lender, including its

management and control rights in both entities.

x.  On June 8, 2006, Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler

Fund IV, Dean Adler, Ginn-LA CS Holding and ERG caused Defendants Ginn

West End to execute a Pledge Agreement and Limited Recourse Guaranty

(Second Lien) on behalf of Defendant Ginn-LA West End LLLP, with

knowledge that it would be transmitted via the Postal Service or private or

commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts. With the Pledge Agreement, Defendant Ginn-LA West End LLLP guaranteed the obligations under the $675 million CSCF by a pledge of 65% of its interests in Ginn-LA International Business Company, Ltd. and 100% of its interests as the sole owner of Defendant Ginn-LA Conduit Lender, including its management and control rights in both entities.

y. On or about June 9, 2006, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA Conduit Lender sent to an agent in the Bahamas via the Postal Service or private or commercial carrier, wire or other interstate media a Supplemental Debenture for $276,750,000 between Ginn-LA West End Ltd and Defendant Ginn-LA Conduit Lender for recording at the Registry of Records in the City of Nassau in the Commonwealth of the Bahamas.

z. On or about June 9, 2006, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA Conduit Lender sent to an agent in the Bahamas via the Postal Service or private or commercial carrier, wire or other interstate media a Promissory Note for $276,750,000 between Ginn-LA West End Limited and Defendant Ginn-LA Conduit Lender for recording at the Registry of Records in the City of Nassau in the Commonwealth of the Bahamas.

aa. On dates presently unknown to Plaintiffs but before March 27, 2007, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate

media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF, and to Standard & Poor's subscribers.

bb. On or about March 27, 2007, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Ratings on Watch Neg; Exposure to Florida's Soft Resort Real Estate Market Cited."

cc. On dates presently unknown to Plaintiffs but before May 1, 2007, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or

private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF, and to Standard & Poor's subscribers.

dd.  On or about May 1, 2007, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Ratings Lowered on Weak Sales and Diminished Recovery Prospects; Still on Watch Neg."

ee.  On or about July 16, 2007, in connection with the 2007 CSCF Default and Restructure, Defendants Ginn-LA OBB, Lubert-Adler, Dean Adler and Lubert-Adler Fund V applied for irrevocable standby line of credit from JP Morgan Chase Bank in the amount of $35.6 million ("JP Morgan Line of Credit"), which application was sent to JP Morgan via the Postal Service or private or commercial carrier, wire or other interstate media.

ff.  On or about July 19, 2007, Defendants Lubert-Adler, Dean Adler and Lubert-Adler Fund V caused JP Morgan to issue a July 19, 2007 Letter of Credit Deutsche Bank as Beneficiary, which Letter of Credit was sent to Deutsche Bank via the Postal Service or private or commercial carrier, wire or other interstate media.  The JP Morgan Line of Credit was intended to fund the construction of a golf course at GSM.  Notwithstanding the August 2008 assurance given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, in 2006, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, the JPMorgan Line of Credit was

necessary because Ginn and Lubert-Adler never created such escrow account in 2006 and did not have funds set aside in escrow for the completion of the GSM golf course.

gg.   On or about July 16, 2007, in connection with the 2007 CSCF Default and Restructure, Defendants Lubert-Adler, Dean Adler and Lubert-Adler Fund IV applied for an irrevocable standby line of credit from Barclays Bank in the amount of $109.1 million ("Barclays Line of Credit") which application was sent to Barclays via the Postal Service or private or commercial carrier, wire or other interstate media.

hh.   On or about July 20, 2007, Defendants Lubert-Adler, Dean Adler and Lubert-Adler Fund IV caused Barclays to issue a July 20, 2007 Letter of Credit Deutsche Bank as Beneficiary, which Letter of Credit was sent to Deutsche Bank via the Postal Service or private or commercial carrier, wire or other interstate media. The Barclays Line of Credit was intended to fund the construction of infrastructure in GSM.  Notwithstanding the August 2008 assurance given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, in 2006, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, the Barclays Line of Credit was necessary because Ginn and Lubert-Adler never created such escrow account in 2006 and did not have funds set aside in escrow for the completion of the GSM infrastructure.

ii.   On or about July 17, 2007, in connection with the 2007 CSCF Default and Restructure, Defendant Ginn West End executed a Security Agreement in

connection with the Barclays Line of Credit, which Security Agreement was sent to Barclays via the Postal Service or private or commercial carrier, wire or other interstate media.

jj.   On dates unknown to Plaintiffs but after July 20, 20078, Defendant Ginn-LA OBB made one or more requests for draws on the JPMorgan Line of Credit via facsimile, wire or other interstate media. These draws were necessary to fund the construction of the GSM golf course. Notwithstanding the August 2008 assurance given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, in 2006, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, draws on the JPMorgan Line of Credit were necessary because Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

kk.   On dates unknown to Plaintiffs but after July 20, 2007, Defendant Lubert-Adler made one or more requests for draws on the Barclays Line of Credit via facsimile, wire or other interstate media. These draws were necessary to fund the construction of the GSM infrastructure. Notwithstanding the August 2008 assurances given by Bobby Ginn that Ginn and Defendant Lubert-Adler had, at the time of the June 8, 2006 CSCF closing, created and funded a "bankruptcy protected" escrow account to insure the completion of GSM infrastructure and a GSM golf course, draws on the Barclays Line of Credit were necessary because Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

ll.     On or about July 20, 2007, in connection with the 2007 CSCF Default and
Restructure, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA OBB
caused the initial developer of GSM (Ginn-LA West End Limited) to convey to
Defendant Ginn-LA OBB those portions of the GSM Land that were designated
for the GSM Resort Core, with knowledge that the documents executed in
connection with this purchase would be transmitted via the Postal Service or
private or commercial carrier, wire or other interstate media to other signatories
of the agreement for execution in counterparts, to Credit Suisse and to other
parties involved with the CSCF. The fact that the GSM Resort Core land had
been conveyed to Defendant Ginn-LA OBB was concealed from GSM
prospective and actual purchasers, including Plaintiffs.

mm.     On or about July 20, 2007, in connection with the 2007 CSCF Default
and Restructure, Defendant Ginn-LA OBB entered into an Assignment
Regarding Heads of Agreement with the initial developer of GSM, with
knowledge that it would be transmitted via the Postal Service or private or
commercial carrier, wire or other interstate media to other signatories of the
agreement for execution in counterparts, to Credit Suisse and to other parties
involved with the CSCF. The Assignment Regarding Heads of Agreement
assigned to Defendant Ginn-LA OBB, in exchange for $10.00, certain of the
rights, benefits and obligations under the Heads of Agreement with the Bahamian
government, including but not limited to an exclusive assignment of all rights
relating to the gaming license of the GSM casino. The fact that rights under the
Heads of Agreement, including but not limited to rights relating to the gaming

license for the GSM casino, were assigned to Defendant Ginn-LA OBB, was concealed from GSM prospective and actual purchasers, including Plaintiffs.

nn.  On or about July 20, 2007, in connection with the 2007 CSCF Default and Restructure, Defendants Lubert-Adler (Dean Adler, as a Director of the initial GSM developer (Ginn-LA West End Limited)) and ERG (through Bobby Ginn, as a Director of Ginn-LA West End Limited) executed a Written Consent of the Board of Directors of Ginn-LA West End Limited, with knowledge that it would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts.  The Written Consent acknowledged that: (1) GSM had been encumbered as security for the $675 million CSCF; (2) the CSCF Borrowers had defaulted under the CSCF; and (3) as part of the 2007 CSCF Restructure following the 2007 CSCF Initial Default, the initial developer of GSM had conveyed the GSM Resort Core to Defendant Ginn-LA OBB.  All of these facts were being concealed from GSM prospective and actual purchasers, including Plaintiffs.

oo.  On dates presently unknown to Plaintiffs but before January 11, 2008, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media.  These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS

Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

pp.  On or about January 11, 2008, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Corporate Credit and Bank Loan Ratings Lowered and Off Watch; Outlook Negative."

qq.  On dates presently unknown to Plaintiffs but before January 14, 2008, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate

media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

rr.   On or about January 14, 2008, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA's Secured Financings."

ss.   On or about January 2008, Defendants Lubert-Adler, Dean Adler and ERG authorized and caused Bobby Ginn to conduct a press tour in January 2008, with knowledge that Bobby Ginn's statements would be transmitted to the general public and GSM purchasers, including Plaintiffs, via the Postal Service or private or commercial carrier, wire or other interstate media. The January 2008 press tour was intended to conceal the existence and the impact of the CSCF on GSM, by spreading the word that GSM development was moving forward, that construction on 375 units was expected to begin in early summer of 2008, that construction on residential lots was expected to begin later in 2009, and that GSM would be "fully operational in our core facilities with our amenities" in five years. These representations were false and misleading because Defendants Lubert-Adler and ERG knew that the terms of the CSCF, as outlined above, would preclude the development of GSM to include the marketed amenities. In addition, Defendants Lubert-Adler and ERG knew that a default under the CSCF had already occurred in 2007 and that a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

tt.   Defendants Lubert-Adler, Dean Adler and ERG authorized and caused a Spring 2008 edition of the *Ginn Sur Mer Living* publication to be sent to GSM purchasers transmitted via the Postal Service or private or commercial carrier, wire or other interstate media.  The publication included a front-page article entitled, "Full Speed Ahead for Ginn sur Mer," in which Bobby Ginn offered assurances that GSM was not subject to the real estate declines seen in the United States:  "Even though the housing and the debt markets in the U.S. and U.K. have slipped, there is still a huge demand for The Bahamas, and we feel like this project is just hitting the market that still wants oceanfront and all of the other services that come along with it."  These representations were false and misleading because Defendants Lubert-Adler and ERG knew that the terms of the CSCF, as outlined above, would preclude the development of GSM to include the marketed amenities.  In addition, Defendants Lubert-Adler and ERG knew that a default under the CSCF had already occurred in 2007 and that a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

uu.   On dates presently unknown to Plaintiffs but before June 24, 2008, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media.  These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA

Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

vv.  On or about June 24, 2008, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Credit Ratings Lowered to 'CC' On Near-Term Liquidity Pressure."

ww.      On or about July 1, 2008, Defendants Lubert-Adler, Dean Adler and ERG authorized and caused Ginn President Robert Gidel to issue a statement concerning the Final CSCF Default ("July 1, 2008 Gidel Statement"). The July 1, 2008 Gidel Statement was intended to reassure the general public and GSM lot owners, including Plaintiffs, that the CSCF default would not impact the development of GSM.

   i.  The July 1, 2008 Gidel Statement described the CSCF as "a non-recourse $675 million credit facility." This representation was false and misleading. While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

ii. The July 1, 2008 Gidel Statement described the CSCF as involving only four Ginn developments: Tesoro, Quail West, Laurelmor and GSM. This representation was false. The CSCF involved five Ginn developments, including one the Gidel Statement failed to acknowledge: Hammock Beach River Club.

iii. The July 1, 2008 Gidel Statement reassured GSM lot owners, "Ginn-LA West End Limited previously set up accounts which contain the funds necessary to complete the infrastructure and the initial 18-hole golf course at Ginn sur Mer. These funds are not subject to the credit facility and are unaffected by the current situation, which means there will be no disruption to the continued development of the Ginn sur Mer project or the operations and development of Old Bahama Bay." This representation was false and misleading. Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

iv. The July 1, 2008 Gidel Statement reassured GSM lot owners, "The properties that are owned by Ginn-LA OBB, including the resort core of the Ginn sur Mer project, are not subject to this or any other credit facility." This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the initial developer Ginn-LA West End sold the GSM Resort Core to Defendant Ginn-LA OBB.

xx.   On dates presently unknown to Plaintiffs but before July 2, 2008, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused financial and other information on the CSCF and on Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender to be sent to the rating agency Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media. These Defendants intended this information to induce Standard & Poor's to provide credit ratings for Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender that would support the issuance of the CSCF. These Defendants provided this information to Standard & Poor's with knowledge that it would be used for ratings statements that would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Credit Suisse, to other parties involved in the CSCF and to Standard & Poor's subscribers.

yy.   On or about July 2, 2008, Defendants Lubert-Adler, Dean Adler, ERG, Ginn-LA West End LLLP, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Standard & Poor's via the Postal Service or private or commercial carrier, wire or other interstate media, a document entitled "Ginn-LA Ratings cut to 'D' on Missed Principal and Interest Payments."

zz.   On or about August 6, 2008, Defendants Lubert-Adler, Dean Adler and ERG authorized and caused Bobby Ginn to appear at a press conference to discuss the CSCF and the status of GSM development ("August 6, 2008 Bobby Ginn Statement"). The August 6, 2008 Bobby Ginn Statement was intended to reassure the general public and GSM lot owners, including Plaintiffs, that the CSCF default would not impact the development of GSM.

i. The August 6, 2008 Bobby Ginn Statement offered reassurances that, "Under the Credit Suisse loan, there were 868 lots. Two hundred of them have been sold and released, so they are in the hands of the independent owners that bought them. So the loan is only on the 668, and some undeveloped properties." This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the initial GSM developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

ii. The August 6, 2008 Bobby Ginn Statement offered reassurances that "when we made that [CSCF] loan, one of the things we did is we took $124 million in cash and put it into a bankruptcy protected escrow account, for the sole purpose of finishing up development in those areas. We took $36 million, and we put it in escrow for the completion of the first golf course." The August 6, 2008 Bobby Ginn Statement offered additional reassurances that "we also wanted to be sure our property owners were protected, so for the people who bought the 200 lots, we put in cash, outside of the CS loan, funded by us, these escrow accounts to finish out that block of work." These representations were false and misleading. By stating that money was in escrow for the "purpose of finishing up development" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that money had been set aside to complete development of the GSM marketed amenities. In addition,

Defendant Lubert-Adler took out lines of credit from Barclays Bank and JP Morgan Bank in June 2007 for the infrastructure and golf course development.

iii. The August 6, 2008 Bobby Ginn Statement offered reassurances that the GSM Resort Core was "[o]utside of that credit, completely unaffected by it." This representation was false and misleading. The CSCF initially included all of the GSM Land. It was not until the 2007 CSCF Restructure following the 2007 CSCF Initial Default that the initial GSM developer (Ginn-LA West End Limited) sold the GSM Resort Core to Defendant Ginn-LA OBB.

iv. The August 6, 2008 Bobby Ginn Statement offered reassurances that the CSCF was "a non-recourse loan." While the CSCF was non-recourse as to Defendants Lubert-Adler and ERG, the CSCF was, in reality, full recourse because all of the GSM Land and the ownership rights in Defendant Ginn-LA West End LLLP were pledged as collateral for the entire $675 million CSCF.

v. The August 6, 2008 Bobby Ginn Statement offered reassurances that "If something goes wrong, and we're continuing to assume that it's not, all the money to develop all of the facilities is in place. It's there now. It's in an escrow account. You can't get any safer than that." This representation was false and misleading. By stating that money was in escrow "to develop all of the facilities" rather than stating that money was in escrow for the completion of the contractually required infrastructure, Ginn implied that

92

money had been set aside to complete development of the GSM marketed amenities.

vi.   The August 6, 2008 Bobby Ginn Statement offered reassurances that, "A hundred percent of the proceeds of the loan go to pay off Credit Suisse. So they are going to be fine. This loan is going to be fine." These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a default under the CSCF had already occurred in 2007, and a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

vii.   The August 6, 2008 Bobby Ginn Statement offered reassurances that because the GSM Resort Core was outside of the CSCF, "regardless of what happens in the economy, the Grand Bahama Project is not in danger." These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM to include the marketed amenities. In addition, a default under the CSCF had already occurred in 2007, and a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

viii.   The August 6, 2008 Bobby Ginn Statement offered reassurances that, "We never want to say something that we can't back up and we never want to sell someone something that we can't back up. We're out of business if we ever do that." These representations were false and misleading because the terms of the CSCF, as outlined above, prevented the development of GSM

to include the marketed amenities. In addition, a default under the CSCF had already occurred in 2007, and a final default under the CSCF was likely in light of the slowdown in the U.S. real estate market.

aaa.     On or about September 10, 2008, Defendants Lubert-Adler, Dean Adler, ERG and Ginn-LA West End LLLP caused to be sent to the U.S. Department of Housing and Urban Development ("HUD") via the Postal Service or private or commercial carrier, wire or other interstate media a request for the suspension of the Statements of Record filed with HUD for four of the CSCF Developments: Tesoro, Quail West, Laurelmor and GSM. The suspension of the HUD Registrations resulted in a legal prohibition on the sale of any residential lots in the affected CSCF Developments. Defendants Lubert-Adler, ERG and Ginn-LA West End LLLP concealed from GSM lot owners, including Plaintiffs, the fact of the suspension of the HUD Registrations, as well as the legal prohibition on the sale of any residential lots in GSM. The HUD suspension came about when, as a result of the Final CSCF Default, HUD issued a directive in September 2008 "that it would administratively undertake" a suspension of the ILSA registrations filed for GSM and other CSCF Developments unless Ginn voluntarily suspended those registrations.

bbb.     On or about October 3, 2008, Defendants Lubert-Adler, Dean Adler, Ginn-LA CS Borrower and Ginn-LA Conduit Lender received from Credit Suisse Cayman Islands (with a Madison Avenue address in New York, New York) via the Postal Service or private or commercial carrier, wire or other interstate media a letter containing notice of "outstanding Defaults and Events of

Default with respect to certain obligations" of Defendants Ginn-LA CS Borrower and Ginn-LA Conduit Lender under the CSCF. Defendants Lubert-Adler, ERG and Ginn-LA West End LLLP concealed from GSM lot owners, including Plaintiffs, the fact of this 2008 default under the CSCF.

ccc.       On December 19, 2008, Defendants CSCF Borrowers, Ginn-LA West End LLLP, Ginn-LA OBB, Ginn West End, ERG, Lubert-Adler and Lubert-Adler Funds III, IV and V entered into the 2008 Master Restructure following the CSCF Final Default with knowledge that those agreements would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts. In connection with the 2008 Master Restructure, Defendants Ginn West End, ERG and Lubert-Adler (collectively "West End Pledgors") agreed that the CSCF was in final default, that the CSCF lenders would foreclose on the Pledge of GSM Interests and the Pledge of GSM Land and that the West End Pledgors had no defense to the foreclosure.

ddd.       As a result of the Final CSCF Default, on May 22, 2009, Credit Suisse filed an action in the Supreme Court of the State of New York to foreclose on the CSCF Pledge of GSM ("GSM Foreclosure"), which was transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to Defendants Lubert-Adler, Dean Adler, Lubert-Adler Fund III, Lubert-Adler Fund IV, Ginn West End, Ginn-LA West End, Ginn-LA CS Holding, Ginn-LA Conduit Lender, Ginn-LA CS Borrower and ERG.

eee.   On December 23, 2009, an Order and Judgment of Foreclosure and Sale

was entered in the GSM Foreclosure ("GSM Foreclosure Judgment") setting

forth an agreed Aggregate Indebtedness in the amount of $ 495,095,611.77,

which was transmitted via the Postal Service or private or commercial carrier,

wire or other interstate media to Defendants Lubert-Adler, Lubert-Adler Fund

III, Lubert-Adler Fund IV, Dean Adler, Ginn West End, Ginn-LA CS Holding,

Ginn-LA West End LLLP, Ginn-LA Conduit Lender, Ginn-LA CS Borrower and

ERG.

278.   Other matters and things sent through or received from the Postal Service

and private or commercial carrier or interstate wire transmission by CSCF Defendants

included information or communication in furtherance of or necessary to effectuate the

schemes outlined above.  Details concerning the exact dates of and persons involved in

sending the following matters or things is in the exclusive control of one or more of the

CSCF Defendants, and/or other persons and are presently unknown to Plaintiffs:

a.   Defendants Lubert-Adler (through Dean Adler and others) and ERG (through

Bobby Ginn and others) engaged in a series of communications via mail and/or

wire among themselves and with others prior to March 20, 2006 concerning

whether to respond to Credit Suisse communications offering its new synthetic

term loan product.

b.   Defendants Lubert-Adler (through Dean Adler and others) and ERG (through

Bobby Ginn and others) engaged in a series of communications via mail and/or

wire among themselves and with others prior to March 30, 2006 concerning

whether to engage Credit Suisse in order to secure "senior secured credit facilities in an aggregate principal amount of up to $800 million."

c. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to March 30, 2006 concerning why it would be beneficial to engage Credit Suisse in order to secure "senior secured credit facilities in an aggregate principal amount of up to $800 million."

d. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to May 12, 2006 concerning the amount of money they intended to borrow and/or would attempt to borrow under the "senior secured credit facilities in an aggregate principal amount of up to $800 million."

e. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to May 12, 2006 concerning how they would structure the "senior secured credit facilities in an aggregate principal amount of up to $800 million," including what entities would serve as "borrowers" thereunder.

f. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to May 12, 2006 concerning how they would structure the "senior secured credit facilities in an aggregate principal

amount of up to $800 million," including how much money Defendants Lubert-Adler and ERG would receive as a "distribution" thereunder.

g.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to May 12, 2006 concerning how they would structure the "senior secured credit facilities in an aggregate principal amount of up to $800 million," including how the credit facilities would be collateralized.

h.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to May 12, 2006 concerning how they would structure the "senior secured credit facilities in an aggregate principal amount of up to $800 million," including how proceeds of the credit facilities would be utilized.

i.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to May 12, 2006 concerning how they would structure the "senior secured credit facilities in an aggregate principal amount of up to $800 million," including what Ginn-LA developments would be part of the credit facilities transaction.

j.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to June 8, 2006 concerning the

exact terms of the $675 million CSCF, including how much money Defendants Lubert-Adler and ERG would receive as a "distribution" from the CSCF proceeds.

k.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to June 8, 2006 concerning the exact terms of the $675 million CSCF, including how the CSCF would be collateralized.

l.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to June 8, 2006 concerning the exact terms of the $675 million CSCF, including how the proceeds of the CSCF would be utilized.

m.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to June 8, 2006 concerning the exact terms of the $675 million CSCF, including what Ginn-LA developments would be part of the CSCF transaction.

n.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others prior to June 8, 2006 concerning the exact terms of the $675 million CSCF, including other topics presently unknown to Plaintiffs but in the exclusive knowledge and control of Defendants.

o. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others from January 2006 to the present concerning whether and how to keep the existence and terms of the $675 million CSCF a secret from prospective GSM purchasers, including Plaintiffs.

p. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others from January 2006 to the present concerning what persons would be informed about the existence and terms of the $675 million CSCF.

q. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others from January 2006 to August 2008 concerning how to make sufficient sales at the CSCF Developments in order to avoid default under the $675 million CSCF.

r. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning the Total Net Value appraisal conducted by GSM.

s. Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning the Project Projections for the CSCF Developments that were provided to Cushman & Wakefield.

t.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning the number of GSM lots to be included in the GSM Project Projections.

u.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning the prices for GSM lots to be included in the GSM Project Projections.

v.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning whether the Project Projections for any of the CSCF Developments were overstated.

w.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning whether sufficient lot sales would be made in order to meet the Project Projections for any of the CSCF Developments.

x.  Defendants Lubert-Adler (through Dean Adler and others) and ERG (through Bobby Ginn and others) engaged in a series of communications via mail and/or wire among themselves and with others concerning the likelihood of a default under the CSCF.

279.     CSCF Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional and made for the purpose of deceiving Plaintiffs and obtaining their money and property for CSCF Defendants' gain.

280.     CSCF Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

281.     As a result of CSCF Defendants' fraudulent schemes, they obtained money and property belonging to Plaintiffs, and Plaintiffs have been injured in their business or property by the CSCF Defendants' overt acts of mail and wire fraud.

### Pattern of Racketeering Activity – CSCF Enterprise

282.     CSCF Defendants did knowingly, willfully and unlawfully conduct or participate in the affairs of the CSCF Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). The racketeering activity was made possible by CSCF Defendants' regular and repeated use of the facilities and services of the CSCF Enterprise.

283.     CSCF Defendants committed or aided and abetted in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341, 1343 and 1344 as described above, within the past five years ("Racketeering Acts"). CSCF Defendants' Racketeering Acts were not isolated, but rather had the same or similar purpose, participants, method of commission, and victims, including Plaintiffs.

284.     Each of the Racketeering Acts were committed pursuant to and in furtherance of the CSCF Enterprise, and such acts include false and misleading statements, as well as other uses of the mails and wire transmissions, to further and execute Defendants' scheme and artifice to defraud.

285.     The multiple Racketeering Acts that CSCF Defendants committed and/or conspired to commit and/or aided and abetted the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## RICO Allegations

### The Enterprise:  Ginn Financial Enterprise

286.     Plaintiffs and Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial, Ginn Title, Bahamas Sales and Bobby Ginn are all "persons" within the meaning of 18 U.S.C. § 1961(3).

287.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiffs refer to as the "Ginn Financial Enterprise":  (1) Ginn Financial; (2) Bahamas Sales; (3) Lubert-Adler; (4) Lubert-Adler Fund IV; (5) Dean Adler; (6) Bobby Ginn; (7) Ginn Title; and (8) other persons presently unknown to Plaintiffs (collectively "Appraisal Fraud Defendants").

288.     The Ginn Financial Enterprise is an ongoing organization that engages in, and which activities affect, interstate and foreign commerce.  At all time relevant to the allegations herein, Appraisal Fraud Defendants did knowingly and willfully make use of the means and instruments of transportation and communications of interstate and foreign commerce to communicate with one another, with prospective purchasers of lots in GSM and with applicants for GSM lot financing.

289.     Although Appraisal Fraud Defendants participate in and are members and part of the Ginn Financial Enterprise, each Appraisal Fraud Defendant also has an existence separate and apart from the Ginn Financial Enterprise.

290.     At all relevant times, the Ginn Financial Enterprise has had an ascertainable structure separate and apart from the pattern of racketeering activity in which Appraisal Fraud Defendants have engaged and their conspiracy to engage in such activity. The primary decision-maker for the Ginn Financial Enterprise were and are Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV, who directed and continue to direct the activities of the Ginn Financial Enterprise.

291.     Appraisal Fraud Defendants control and operate the Ginn Financial Enterprise through a variety of means including, but not limited to, the following:

a.  Offering GSM purchasers lot loans through Defendant Ginn Financial;

b.  Suborning inflated and unsupported appraisals intended to support the Mortgagor Plaintiffs' GSM mortgage loans;

c.  Utilizing inflated and unsupported appraisals to inflate the lot prices for all GSM lots;

d.  Agreeing to facilitate and facilitating the approval and closing of the Mortgagor Plaintiffs' GSM mortgage loans at amounts that were based upon the inflated and unsupported appraisals;

e.  Agreeing to conceal and concealing their fraudulent scheme to set inflated and unsupported sales prices for GSM lots;

f.  Agreeing to conceal and concealing their fraudulent scheme to facilitate the approval and closing of the Mortgagor Plaintiffs' GSM mortgage loans at amounts that were based upon the inflated and unsupported appraisals; and

g.  Agreeing to conceal and concealing their fraudulent scheme to suborn inflated and unsupported appraisals intended to support the Mortgagor Plaintiffs' GSM mortgage loans; and

h. Agreeing to conceal and concealing their fraudulent scheme to suborn inflated and unsupported appraisals to inflate the lot prices for all GSM lots.

292.     The Ginn Financial Enterprise has pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud GSM lot purchasers and to collect profits from the fraudulent, misleading and unlawful actions of the Ginn Financial Enterprise.  Those actions began before Plaintiffs contracted to buy GSM lots, continue to the present and threaten to continue into the future.

293.     The formation, existence and actions of the Ginn Financial Enterprise were and are essential to the success of its fraudulent, misleading and unlawful actions.

**Predicate Acts- Mail, Wire and Bank Fraud: Ginn Financial Enterprise**

294.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to bank fraud). Appraisal Fraud Defendants have engaged and continue to engage in conduct violating each of these laws in an effort to effectuate the mortgage fraud scheme.

295.     For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, Appraisal Fraud Defendants in violation of 18 U.S.C. § 1341 caused matter and things to be delivered by the Postal Service or by private or commercial interstate carriers. These acts were done intentionally and knowingly with the specific intent to advance Appraisal Fraud Defendants' schemes, or with knowledge that the use of mails would follow in the ordinary course of business, or

that such use could have been foreseen, even if not actually intended.

296.     Appraisal Fraud Defendants carried out their scheme in different states within the United States and in other countries and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

297.     For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, Appraisal Fraud Defendants in violation of 18 U.S.C. § 1343 did transmit, cause to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs, and signals. These acts were done intentionally and knowingly with the specific intent to advance Appraisal Fraud Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

298.     The matter and things sent by Appraisal Fraud Defendants via the Postal Service or private or commercial carrier, wire or other interstate media include, but are not limited to, the following:

   a.   On or about June 10, 2005, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused information to be sent to the Georgia Secretary of State, Corporations Division via the Postal Service or private or commercial carrier, wire or other interstate media for the formation of Defendant Ginn Financial as a Georgia Limited Liability Company.

   b.   On or about June 14, 2005, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused information to be sent to the Florida

Secretary of State via the Postal Service or private or commercial carrier, wire or other interstate media in support of an Application for Authorization to Transact Business in the State of Florida on behalf of Defendant Ginn Financial.

c.  On or about January 12, 2006, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused a 2006 Limited Liability Corporation Annual Report to be filed with the Florida Secretary of State via the Postal Service or private or commercial carrier, wire or other interstate media for Defendant Ginn Financial.

d.  Beginning on or about June 2006, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused a website for Ginn Financial to include the following representations:

   i.  Ginn Financial was "The Preferred Lender For Ginn Buyers."

   ii.  Ginn Financial was "a licensed mortgage lender in the State of Florida; License # L100000558788."

   iii.  "In-House Financing" through Ginn Financial "Eliminates Communication Issues and Expedites the Closing Process."

   iv.  Ginn Financial offered "80% Loan to Value" "Stated Income" mortgage loans for qualified GSM lot purchasers.

   v.  Ginn Financial offered "specialized loan programs for Ginn sur Mer."

   vi.  Because "financing options are different in the Bahamas than in the United States," Ginn Financial would assist GSM lot purchasers through the process of obtaining mortgage loans.

e. From around August 2006 through 2007, Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV authorized and caused Defendant Ginn Financial to recommend to Mortgagor Plaintiffs via the Postal Service or private or commercial carrier, wire or other interstate media that they could obtain 80% loan-to-value financing for GSM lot purchases through Defendant Ginn Financial.

f. On or about August 7, 2006, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused information to be sent to the Delaware Department of State, Division of Corporations via the Postal Service or private or commercial carrier, wire or other interstate media for the formation of Defendant Bahamas Sales Associate, LLC.  Defendant Bahamas Sales was a single-purpose entity formed for the sole purpose of closing on those GSM mortgage loans provided to Mortgagor Plaintiffs, even though Defendant Bahamas Sales was not a licensed mortgage lender, correspondent mortgage lender or mortgage broker in any state.

g. Beginning in Fall 2006, Defendant Ginn Financial engaged in a series of telephone conversations with Richard Allen at Pomeroy Appraisal:

   i. In Fall 2006, CEO McCracken telephoned Richard Allen to introduce himself and inform Mr. Allen that Ginn Financial was looking for a firm to provide appraisals for lots in GSM.

   ii. In Fall 2006, Defendant Ginn Financial engaged in a series of emails with Pomeroy to arrange for Ginn Financial to fly the Pomeroy partners to the Bahamas on a Ginn corporate jet for a 1-day trip to meet with various Ginn sales and development people.

iii. In Fall 2006, after Ginn Financial flew the Pomeroy partners to the Bahamas, CEO McCracken and others from Ginn Financial spoke with Richard Allen about the scope of the engagement and agreed upon Pomeroy's charges for conducting appraisals. At that time, Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV authorized and caused Ginn Financial to engage Pomeroy to provide appraisals for GSM lots.

iv. In Fall 2006 after retaining Pomeroy, Defendant Ginn Financial engaged in a series of emails with Pomeroy to arrange for Ginn Financial to fly the Pomeroy partners to the Bahamas on a Ginn corporate jet for an investigatory trip to evaluate the real estate market, evaluate GSM, inspect comparable sales properties and speak with local realtors.

v. In Fall 2006, representatives of Ginn Financial spoke with Richard Allen by telephone. Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV authorized and caused Defendant Ginn Financial to inform Pomeroy that the lot sales price was the target value for appraisals to be issued by Pomeroy. During the call, Pomeroy informed Ginn Financial that Pomeroy's analysis would not be based on any predetermined target value, estimate or contract price. Pomeroy informed Ginn Financial that the market value determined by Pomeroy's appraisals would be based only upon Pomeroy's investigation and analysis.

vi. In Fall 2006, representatives of Ginn Financial spoke with Richard Allen by telephone after Pomeroy began putting together a rough analysis for the

GSM lot appraisals. During this call, Pomeroy discussed with Ginn Financial how lot prices in GSM measured against comparable sales on Grand Bahama Island but outside GSM ("Grand Bahama Comparables"). Pomeroy informed Ginn Financial that GSM lot prices were significantly higher than sales prices for the Grand Bahama Comparables. Those on the call agreed the Grand Bahama Comparables did not offer amenities that Ginn was marketing for GSM. Pomeroy informed Ginn Financial that Pomeroy would need to establish the difference between lots with and without amenities that were marketed for GSM in order to understand how to measure the Grand Bahama Comparables. Pomeroy informed Ginn Financial this would be a difficult task and it would take some time to do this analysis.

vii. In Fall 2006, representatives of Ginn Financial spoke with Richard Allen by telephone after Pomeroy began putting together a rough analysis for GSM lot appraisals. During this call, Ginn Financial pressured Pomeroy to provide appraisals very quickly. Pomeroy told Ginn Financial Pomeroy could not produce appraisals without first undertaking a complete investigation and analysis of the market. Pomeroy explained that without a complete investigation and analysis, Mr. Allen and his partner would not consider themselves competent in the area and would not be able to provide appraisals.

viii. In Fall 2006, representatives of Ginn Financial spoke with Richard Allen by telephone after Pomeroy began putting together a rough analysis for

GSM lot appraisals.  During this call, Pomeroy informed Ginn Financial that, as part of Pomeroy's complete investigation and analysis, Pomeroy would need to consider comparable lot sales on Grand Bahama Island but outside GSM. In response, with the authorization of Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV, Defendant Ginn Financial pressured Pomeroy to consider the GSM sales as the only comparables and asked why Pomeroy needed to go outside GSM for comparables.  Pomeroy agreed to look at the GSM sales in addition to the comparables Pomeroy obtained from outside GSM.  Pomeroy informed Ginn Financial that the problem with using only GSM sales as comparables was that many buyers had been flown into the private airstrip on GSM by Ginn and had not had an opportunity to price lots offered outside the subdivision before making their purchase decisions.  Pomeroy explained it was not comfortable only using closed sales within GSM as comparables because Pomeroy had not yet completed its investigation and analysis and thus did not yet fully understand the Bahamian real estate market.  Pomeroy further informed Ginn Financial that any U.S. lender would want to see appraisals based on comparables from outside of GSM.  In response, CEO McCracken strongly disagreed.  In a heated conversation and with the authorization of Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV, CEO McCracken informed Pomeroy that Ginn Financial only wanted Pomeroy to use closed sales within GSM as comparables and that Ginn Financial did not want Pomeroy to use any

comparable sales from outside of GSM. Pomeroy informed Ginn Financial that if Pomeroy agreed to consider closed sales from within GSM as comparables, Pomeroy's appraisals would have to indicate that they were "subject to" the completion of the infrastructure and amenities that Ginn was marketing for GSM. Pomeroy informed Ginn Financial that Pomeroy had to protect itself, and thus Pomeroy would only agree to provide "subject to" appraisals. Pomeroy made it clear that if Ginn Financial would not accept "subject to" appraisals, Pomeroy would not provide the appraisals at all. In response, with the authorization of Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV, Defendant Ginn Financial asked Pomeroy to provide rough drafts of what Pomeroy's appraisal would look like for several lots.

ix.   In Fall 2006, representatives of Ginn Financial spoke with Richard Allen by telephone after they received Pomeroy's rough drafts of GSM lot appraisals. During this call, with the authorization of Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV, Defendant Ginn Financial asked Pomeroy to remove the "subject to" comments from the draft appraisals. When Pomeroy refused, Ginn Financial said it would get back to Pomeroy.

x.   In Fall 2006, less than an hour after the call concerning Pomeroy's rough drafts of the GSM lot appraisals, with the authorization of Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV,

112

Defendant Ginn Financial telephoned Pomeroy to say that Ginn Financial was "going to go in another direction."

h.  In Fall 2006, with the authorization of Defendants Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV, Defendant Ginn Financial made arrangements via the Postal Service or private or commercial carrier, wire or other interstate media to fly the Pomeroy partners to the Bahamas on a Ginn corporate jet for a 1-day trip to meet with Ginn sales and development people.

i.  On or about September 25, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 98. The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

j.  On or about September 25, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 146. The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

k.  On or about September 25, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 109, which was being purchased by Plaintiffs Maciag. The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

l.  On or about September 27, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request

for Appraisal for GSM Lot 103.  The Request for Appraisal improperly included a sales price for the lot to be appraised.

m.  On or about September 27, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 104.  The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

n.  On or about September 27, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 45.  The Request for Appraisal improperly included a sales price for the lot to be appraised.

o.  On or about September 29, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 38.  The Request for Appraisal improperly included a sales price for the lot to be appraised.

p.  On or about October 3, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 194.  The Request for Appraisal improperly included a sales price for the lot to be appraised.

q.  On or about October 3, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 37.  The Request for Appraisal improperly included a sales price for the lot to be appraised.

r. On or about October 3, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 46. The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

s. On or about October 3, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 136. The Request for Appraisal improperly included a sales price for the lot to be appraised.

t. On or about October 3, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 89. The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

u. On or about October 4, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 80. The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

v. On or about October 5, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 56. The Request for Appraisal improperly included a sales price for the lot to be appraised.

w. On or about October 27, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request

for Appraisal for GSM Lot 88.  The Request for Appraisal improperly included a sales price and an "Estimated Value" figure for the lot to be appraised.

x.   On or about October 30, 2006, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a Request for Appraisal for GSM Lot 432.  The Request for Appraisal improperly included a sales price for the lot to be appraised.

y.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media the Final Completion Statement and other closing documents for the sale of Lot 18.  Ginn Financial intended the Completion Statement to serve as the only basis for Pomeroy's valuation of other GSM lots.

z.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media the Final Completion Statement and other closing documents for the sale of Lot 90.  Ginn Financial intended the Completion Statement to serve as the only basis for Pomeroy's valuation of other GSM lots.

aa.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media the Final Completion Statement for the sale of Lot 97.  Ginn Financial intended the Completion Statement to serve as the only basis for Pomeroy's valuation of other GSM lots.

bb.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier,

116

wire or other interstate media the Final Completion Statement and other closing documents for the sale of Lot 133.  Ginn Financial intended the Completion Statement to serve as the only basis for Pomeroy's valuation of other GSM lots.

cc.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media the Final Completion Statement and other closing documents for the sale of Lot 190.  Ginn Financial intended the Completion Statement to serve as the only basis for Pomeroy's valuation of other GSM lots.

dd.   On or about October 27, 2006, Ginn Financial received from Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a DRAFT Land Appraisal Report for GSM Lot 74.  The draft stated in three separate places that it was subject to the completion of infrastructure and certain amenities as described in a detailed "Project Amenity Description."  Ginn Financial pressured Pomeroy to remove the "subject to" language.  When Pomeroy refused, Defendant Bobby Ginn authorized and caused Ginn Financial to reject the DRAFT Land Appraisal Report and to terminate the services of Pomeroy.

ee.   On or about October 27, 2006, Ginn Financial received from Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a DRAFT Land Appraisal Report for GSM Lot 80.  The draft stated in three separate places that it was subject to the completion of infrastructure and certain amenities as described in a detailed "Project Amenity Description."  Ginn Financial pressured Pomeroy to remove the "subject to" language.  When

Pomeroy refused, Defendant Bobby Ginn authorized and caused Ginn Financial to reject the DRAFT Land Appraisal Report and to terminate the services of Pomeroy.

ff.   On or about October 27, 2006, Ginn Financial received from Pomeroy via the Postal Service or private or commercial carrier, wire or other interstate media a DRAFT Land Appraisal Report for GSM Lot 103. The draft stated in three separate places that it was subject to the completion of infrastructure and certain amenities as described in a detailed "Project Amenity Description." Ginn Financial pressured Pomeroy to remove the "subject to" language. When Pomeroy refused, Defendant Bobby Ginn, Lubert-Adler, Dean Adler and Lubert-Adler Fund IV authorized and caused Ginn Financial to reject the DRAFT Land Appraisal Report and to terminate the services of Pomeroy.

gg.   On October 31, 2006, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bobby Ginn caused Defendant Bahamas Sales to enter into a "Receivables Loan and Security Agreement" with Capital Source ("CapitalSource Loan Agreement") pursuant to which Bahamas Sales obtained the Capital Source Credit Line.

hh.   On November 2, 2006, Ginn Financial sent an email to Pomeroy stating, "Please cancel all the orders for Bahamas Appraisals. We have run it by our investors and a 'Subject to' valuation is unacceptable."

ii.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiffs Todd and Maureen Taliaferro via the Postal Service or private or commercial carrier, wire or other interstate media a mortgage loan

application, which Plaintiffs Taliaferro executed.  This mortgage loan application listed Ginn Financial as the lender for Plaintiffs Taliaferro's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

jj.  On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiffs Taliaferro via the Postal Service or private or commercial carrier, wire or other interstate media an Affiliated Business Arrangement Disclosure Statement Notice.  This Notice stated that Ginn Financial was requiring Plaintiffs Taliaferro to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

kk.  On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial requested via the Postal Service or private or commercial carrier, wire or other interstate media that W. Carver Grant & Co., a Bahamian engineer, provide an appraisal for GSM Lot 208, which was being purchased by Plaintiffs Taliaferro.

ll.  On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial received an appraisal from W. Carver Grant & Co. via the Postal Service or private or commercial carrier, wire or other interstate media for GSM Lot 208, which was being purchased by Plaintiffs Taliaferro.  The W. Carver Grant appraisal was inflated, unsupported and did not comply with the Uniform Standards of Professional Appraisal Practice.

mm.      On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial sent Plaintiffs Taliaferro via the Postal Service or private or

commercial carrier, wire or other interstate media a Good Faith Estimate of

closing costs for Plaintiff Taliaferro's mortgage loan.  This Good Faith listed

Ginn Financial as the lender for Plaintiffs Taliaferro's mortgage loan, when in

fact that loan was closed with Bahamas Sales, which is not licensed as a

mortgage lender, as the lender.

nn.  On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial sent Plaintiffs Taliaferro via the Postal Service or private or

commercial carrier, wire or other interstate media a packet of mortgage loan

closing documents for Plaintiffs Taliaferro's GSM mortgage loan.  This packet of

closing listed Bahamas Sales as the lender for Plaintiff Taliaferro's mortgage

loan.

oo.  On or about February 16, 2007, Defendants Lubert-Adler, Lubert-Adler Fund

IV, Dean Adler, Ginn Financial and Bobby Ginn caused Bahamas Sales and

Ginn Title to close Plaintiffs Taliaferro's mortgage loan for GSM Lot 208, with

Bahamas Sales acting as the mortgage lender, with knowledge that the closing

documents would be transmitted via the Postal Service or private or commercial

carrier, wire or other interstate media to other signatories of the agreement for

execution in counterparts, and/or to an agent for filing in the Bahamas.

pp.  On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial sent Plaintiffs Arthur and Alexandria Maciag via the Postal Service or

private or commercial carrier, wire or other interstate media a mortgage loan

application, which Plaintiffs Maciag executed. This mortgage loan application listed Ginn Financial as the lender for Plaintiffs Maciag's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

qq. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiffs Maciag via the Postal Service or private or commercial carrier, wire or other interstate media an Affiliated Business Arrangement Disclosure Statement Notice. This Notice stated that Ginn Financial was requiring Plaintiffs Maciag to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

rr. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial requested via the Postal Service or private or commercial carrier, wire or other interstate media that W. Carver Grant & Co., a Bahamian engineer, provide an appraisal for GSM Lot 109, which was being purchased by Plaintiffs Maciag.

ss. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial received an appraisal from W. Carver Grant & Co. via the Postal Service or private or commercial carrier, wire or other interstate media for GSM Lot 109, which was being purchased by Plaintiffs Maciag. The W. Carver Grant appraisal was inflated, unsupported and did not comply with the Uniform Standards of Professional Appraisal Practice.

tt.    On a date presently unknown to Plaintiffs but known to Defendants, Ginn
Financial sent Plaintiffs Maciag via the Postal Service or private or commercial
carrier, wire or other interstate media a Good Faith Estimate of closing costs for
Plaintiff Maciag's mortgage loan.  This Good Faith listed Ginn Financial as the
lender for Plaintiffs Maciag's mortgage loan, when in fact that loan was closed
with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

uu.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn
Financial sent Plaintiffs Maciag via the Postal Service or private or commercial
carrier, wire or other interstate media a packet of mortgage loan closing
documents for Plaintiffs Maciag's GSM mortgage loan.  This packet of closing
listed Bahamas Sales as the lender for Plaintiff Maciag's mortgage loan.

vv.   On or about February 16, 2007, Defendants Lubert-Adler, Lubert-Adler Fund
IV, Dean Adler, Ginn Financial and Bobby Ginn caused Bahamas Sales and
Ginn Title to close Plaintiffs Maciag's mortgage loan for GSM Lot 109, with
Bahamas Sales acting as the mortgage lender, with knowledge that the closing
documents would be transmitted via the Postal Service or private or commercial
carrier, wire or other interstate media to other signatories of the agreement for
execution in counterparts, and/or to an agent for filing in the Bahamas.

ww.     On a date presently unknown to Plaintiffs but known to Defendants, Ginn
Financial sent Plaintiff Rick Clemmons via the Postal Service or private or
commercial carrier, wire or other interstate media a mortgage loan application,
which Plaintiff Clemmons executed.  This mortgage loan application listed Ginn
Financial as the lender for Plaintiffs Clemmons' mortgage loan, when in fact that

loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

xx. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Clemmons via the Postal Service or private or commercial carrier, wire or other interstate media an Affiliated Business Arrangement Disclosure Statement Notice. This Notice stated that Ginn Financial was requiring Plaintiff Clemmons to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

yy. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial requested via the Postal Service or private or commercial carrier, wire or other interstate media that W. Carver Grant & Co., a Bahamian engineer, provide an appraisal for GSM Lot 494, which was being purchased by Plaintiffs Clemmons and Sell.

zz. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial received an appraisal from W. Carver Grant & Co. via the Postal Service or private or commercial carrier, wire or other interstate media for GSM Lot 494, which was being purchased by Plaintiffs Clemmons and Sell. The W. Carver Grant appraisal was inflated, unsupported and did not comply with the Uniform Standards of Professional Appraisal Practice.

aaa. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Clemmons via the Postal Service or private or commercial carrier, wire or other interstate media a Good Faith Estimate of

closing costs for Plaintiff Clemmons' mortgage loan. This Good Faith listed Ginn Financial as the lender for Plaintiffs Clemmons' mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

bbb.    On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Clemmons via the Postal Service or private or commercial carrier, wire or other interstate media a packet of mortgage loan closing documents for Plaintiffs Clemmons' GSM mortgage loan. This packet of closing listed Bahamas Sales as the lender for Plaintiff Clemmons' mortgage loan.

ccc.    On or about February 16, 2007, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bobby Ginn caused Bahamas Sales and Ginn Title to close Plaintiffs Clemmons' mortgage loan for GSM Lot 494, with Bahamas Sales acting as the mortgage lender, with knowledge that the closing documents would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts, and/or to an agent for filing in the Bahamas.

ddd.    On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff James Carell via the Postal Service or private or commercial carrier, wire or other interstate media a mortgage loan application, which Plaintiff Carell executed. This mortgage loan application listed Ginn Financial as the lender for Plaintiffs Carell's mortgage loan, when in fact that

loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

eee.        On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Carell via the Postal Service or private or commercial carrier, wire or other interstate media an Affiliated Business Arrangement Disclosure Statement Notice.  This Notice stated that Ginn Financial was requiring Plaintiff Carell to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

fff.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial requested via the Postal Service or private or commercial carrier, wire or other interstate media that W. Carver Grant & Co., a Bahamian engineer, provide an appraisal for GSM Lot 312, which was being purchased by Plaintiffs Carell and Sell.

ggg.        On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial received an appraisal from W. Carver Grant & Co. via the Postal Service or private or commercial carrier, wire or other interstate media for GSM Lot 312, which was being purchased by Plaintiffs Carell and Sell.  The W. Carver Grant appraisal was inflated, unsupported and did not comply with the Uniform Standards of Professional Appraisal Practice.

hhh.        On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Carell via the Postal Service or private or commercial carrier, wire or other interstate media a Good Faith Estimate of closing costs for

Plaintiff Carell's mortgage loan. This Good Faith listed Ginn Financial as the lender for Plaintiff Carell's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

iii.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Carell via the Postal Service or private or commercial carrier, wire or other interstate media a packet of mortgage loan closing documents for Plaintiff Carell's GSM mortgage loan. This packet of closing listed Bahamas Sales as the lender for Plaintiff Carell's mortgage loan.

jjj.   On or about February 16, 2007, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bobby Ginn caused Bahamas Sales and Ginn Title to close Plaintiff Carell's mortgage loan for GSM Lot 312, with Bahamas Sales acting as the mortgage lender, with knowledge that the closing documents would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts, and/or to an agent for filing in the Bahamas.

kkk.     On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Thomas Hoyer via the Postal Service or private or commercial carrier, wire or other interstate media a mortgage loan application, which Plaintiff Hoyer executed. This mortgage loan application listed Ginn Financial as the lender for Plaintiff Hoyer's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

lll. On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial sent Plaintiff Hoyer via the Postal Service or private or commercial

carrier, wire or other interstate media an Affiliated Business Arrangement

Disclosure Statement Notice.  This Notice stated that Ginn Financial was

requiring Plaintiff Hoyer to use U.S. real estate appraiser Pomeroy Appraisal

Associates of Florida, Inc. "as a condition of your loan on this property, to

represent our interests in the transaction."

mmm.     On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial requested via the Postal Service or private or commercial carrier, wire

or other interstate media that W. Carver Grant & Co., a Bahamian engineer,

provide an appraisal for GSM Lot 448, which was being purchased by Plaintiffs

Hoyer and Freeman.

nnn.     On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial received an appraisal from W. Carver Grant & Co. via the Postal

Service or private or commercial carrier, wire or other interstate media for GSM

Lot 448, which was being purchased by Plaintiffs Hoyer and Freeman.  The W.

Carver Grant appraisal was inflated, unsupported and did not comply with the

Uniform Standards of Professional Appraisal Practice.

ooo.     On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial sent Plaintiff Hoyer via the Postal Service or private or commercial

carrier, wire or other interstate media a Good Faith Estimate of closing costs for

Plaintiff Hoyer's mortgage loan.  This Good Faith listed Ginn Financial as the

lender for Plaintiff Hoyer's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

ppp.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiff Hoyer via the Postal Service or private or commercial carrier, wire or other interstate media a packet of mortgage loan closing documents for Plaintiff Hoyer's GSM mortgage loan. This packet of closing listed Bahamas Sales as the lender for Plaintiff Hoyer's mortgage loan.

qqq.   On or about February 16, 2007, Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bobby Ginn caused Bahamas Sales and Ginn Title to close Plaintiff Hoyer's mortgage loan for GSM Lot 448, with Bahamas Sales acting as the mortgage lender, with knowledge that the closing documents would be transmitted via the Postal Service or private or commercial carrier, wire or other interstate media to other signatories of the agreement for execution in counterparts, and/or to an agent for filing in the Bahamas.

rrr. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiffs Fresonke Group via the Postal Service or private or commercial carrier, wire or other interstate media a mortgage loan application, which Plaintiffs Fresonke Group executed. This mortgage loan application listed Ginn Financial as the lender for Plaintiffs Fresonke Group's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

sss. On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiffs Fresonke Group via the Postal Service or private or

commercial carrier, wire or other interstate media an Affiliated Business Arrangement Disclosure Statement Notice. This Notice stated that Ginn Financial was requiring Plaintiffs Fresonke Group to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

ttt.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial requested via the Postal Service or private or commercial carrier, wire or other interstate media that W. Carver Grant & Co., a Bahamian engineer, provide an appraisal for GSM Lot 437, which was being purchased by Plaintiffs Fresonke Group.

uuu.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial received an appraisal from W. Carver Grant & Co. via the Postal Service or private or commercial carrier, wire or other interstate media for GSM Lot 437, which was being purchased by Plaintiffs Fresonke Group. The W. Carver Grant appraisal was inflated, unsupported and did not comply with the Uniform Standards of Professional Appraisal Practice.

vvv.   On a date presently unknown to Plaintiffs but known to Defendants, Ginn Financial sent Plaintiffs Fresonke Group via the Postal Service or private or commercial carrier, wire or other interstate media a Good Faith Estimate of closing costs for Plaintiff Fresonke Group's mortgage loan. This Good Faith listed Ginn Financial as the lender for Plaintiffs Fresonke Group's mortgage loan, when in fact that loan was closed with Bahamas Sales, which is not licensed as a mortgage lender, as the lender.

www.     On a date presently unknown to Plaintiffs but known to Defendants, Ginn

Financial sent Plaintiffs Fresonke Group via the Postal Service or private or

commercial carrier, wire or other interstate media a packet of mortgage loan

closing documents for Plaintiffs Fresonke Group's GSM mortgage loan.  This

packet of closing listed Bahamas Sales as the lender for Plaintiffs Fresonke

Group's mortgage loan.

xxx.     On or about February 16, 2007, Defendants Lubert-Adler, Lubert-Adler

Fund IV, Dean Adler, Ginn Financial and Bobby Ginn caused Bahamas Sales

and Ginn Title to close Plaintiffs Fresonke Group's mortgage loan for GSM Lot

437, with Bahamas Sales acting as the mortgage lender, with knowledge that the

closing documents would be transmitted via the Postal Service or private or

commercial carrier, wire or other interstate media to other signatories of the

agreement for execution in counterparts, and/or to an agent for filing in the

Bahamas.

yyy.     On or about March 7, 2007, Defendants Bobby Ginn, Lubert-Adler and

Lubert-Adler Fund IV authorized and caused a 2007 Limited Liability

Corporation Annual Report to be filed with the Florida Secretary of State via the

Postal Service or private or commercial carrier, wire or other interstate media for

Ginn Financial.

zzz.     On or about April 23, 2007, Defendants Bobby Ginn, Lubert-Adler and

Lubert-Adler Fund IV authorized and caused a 2007 Limited Liability

Corporation Annual Report to be filed with the Florida Secretary of State via the

Postal Service or private or commercial carrier, wire or other interstate media for

Bahamas Sales.

aaaa.        On or about September 4, 2007, Defendants Bobby Ginn, Lubert-Adler

and Lubert-Adler Fund IV authorized and caused a 2007 Amended Limited

Liability Corporation Annual Report to be filed with the Florida Secretary of

State via the Postal Service or private or commercial carrier, wire or other

interstate media for Ginn Financial.

bbbb.        On or about November 2007, Lubert-Adler and Lubert-Adler Fund IV

took an equity distribution from Defendant Bahamas Sales, with knowledge that

financial statements and other documents reflecting the equity distribution would

be sent via the Postal Service or private or commercial carrier, wire or other

interstate media.

cccc.        On or about December 2007, Lubert-Adler and Lubert-Adler Fund IV

took an equity distribution from Defendant Bahamas Sales, with knowledge that

financial statements and other documents reflecting the equity distribution would

be sent via the Postal Service or private or commercial carrier, wire or other

interstate media.

dddd.        On or about January 2008, Lubert-Adler and Lubert-Adler Fund IV took

an equity distribution from Defendant Bahamas Sales, with knowledge that

financial statements and other documents reflecting the equity distribution would

be sent via the Postal Service or private or commercial carrier, wire or other

interstate media.

eeee.     On or about January 16, 2008, Defendants Bobby Ginn, Lubert-Adler
and Lubert-Adler Fund IV authorized and caused a 2008 Limited Liability
Corporation Annual Report to be filed with the Florida Secretary of State via the
Postal Service or private or commercial carrier, wire or other interstate media for
Ginn Financial.

ffff.     On or about February 2008, Lubert-Adler and Lubert-Adler Fund IV took
an equity distribution from Defendant Bahamas Sales, with knowledge that
financial statements and other documents reflecting the equity distribution would
be sent via the Postal Service or private or commercial carrier, wire or other
interstate media.

gggg.     On or about March 2008, Lubert-Adler and Lubert-Adler Fund IV took an
equity distribution from Defendant Bahamas Sales, with knowledge that financial
statements and other documents reflecting the equity distribution would be sent
via the Postal Service or private or commercial carrier, wire or other interstate
media.

hhhh.     On or about April 2008, Lubert-Adler and Lubert-Adler Fund IV took an
equity distribution from Defendant Bahamas Sales, with knowledge that financial
statements and other documents reflecting the equity distribution would be sent
via the Postal Service or private or commercial carrier, wire or other interstate
media.

iiii.   On or about April 22, 2008, Defendants Bobby Ginn, Lubert-Adler and Lubert-
Adler Fund IV authorized and caused a 2008 Limited Liability Corporation
Annual Report to be filed with the Florida Secretary of State via the Postal

Service or private or commercial carrier, wire or other interstate media for Bahamas Sales.

jjjj. On or about May 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

kkkk.     On or about June 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

llll. On or about July 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

mmmm.   On or about August 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

nnnn.   On or about September 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

oooo.   On or about October 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

pppp.   On or about November 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

qqqq.   On or about December 2008, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

rrrr.   On or about January 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would

be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

ssss.    On or about February 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

tttt.  On or about March 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

uuuu.    On or about April 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

vvvv.    On or about April 30, 2009, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused a 2009 Limited Liability Corporation Annual Report to be filed with the Florida Secretary of State via the Postal Service or private or commercial carrier, wire or other interstate media for Ginn Financial.

wwww.   On or about April 30, 2009, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused a 2009 Limited Liability Corporation Annual Report to be filed with the Florida Secretary of State via the Postal Service or private or commercial carrier, wire or other interstate media for Bahamas Sales.

xxxx.   On or about May 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

yyyy.   On or about June 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

zzzz.   On or about July 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent via the Postal Service or private or commercial carrier, wire or other interstate media.

aaaaa.   On or about August 2009, Lubert-Adler and Lubert-Adler Fund IV took an equity distribution from Defendant Bahamas Sales, with knowledge that financial statements and other documents reflecting the equity distribution would be sent

via the Postal Service or private or commercial carrier, wire or other interstate media.

bbbbb.   On or about March 17, 2010, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused a 2010 Limited Liability Corporation Annual Report to be filed with the Florida Secretary of State via the Postal Service or private or commercial carrier, wire or other interstate media for Ginn Financial.

ccccc.   On or about March 18, 2010, Defendants Bobby Ginn, Lubert-Adler and Lubert-Adler Fund IV authorized and caused a 2010 Limited Liability Corporation Annual Report to be filed with the Florida Secretary of State via the Postal Service or private or commercial carrier, wire or other interstate media for Bahamas Sales.

299.   Other matters and things sent through or received from the Postal Service and private or commercial carrier or interstate wire transmission by Appraisal Fraud Defendants included information or communication in furtherance of or necessary to effectuate the schemes outlined above. Details concerning the exact dates of and persons involved in sending the following matters or things is in the exclusive control of one or more of Appraisal Fraud Defendants, and/or other persons and are presently unknown to Plaintiffs:

a. Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bahamas Sales engaged in a series of communications via mail and/or wire among themselves and with others prior to October 2006 concerning the use of inflated and unsupported appraisals that did not comply with the

Uniform Standards of Professional Appraisal Practice to justify the sale and financing of Plaintiffs' GSM lot purchases at inflated prices based upon marketed amenities that did not exist at the time of the appraisals.

b. Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bahamas Sales engaged in a series of communications via mail and/or wire among themselves and with others prior to October 2006 concerning the use of Pomeroy.

c. Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bahamas Sales engaged in a series of communications via mail and/or wire among themselves and with others prior to October 2006 concerning the communications that Defendant Ginn Financial had with Pomeroy.

d. Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bahamas Sales engaged in a series of communications via mail and/or wire among themselves and with others prior to October 2006 concerning the decision to terminate the relationship with Pomeroy.

e. Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bahamas Sales engaged in a series of communications via mail and/or wire among themselves and with others prior to October 2006 concerning the retention of another appraiser following the decision to terminate the relationship with Pomeroy.

f. Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial and Bahamas Sales engaged in a series of communications via mail and/or wire among themselves and with W. Carver Grant prior to October 2006

concerning how Defendants Bobby Ginn, Lubert-Adler, Lubert-Adler Fund IV,

Ginn Financial and Bahamas Sales wanted W. Carver Grant to prepare the

appraisals for GSM lots.

300.    Other matters and things sent through or received from the Postal Service

and private or commercial carrier or interstate wire transmission by Appraisal Fraud

Defendants included information or communication in furtherance of or necessary to

effectuate the schemes outlined above.

301.    Appraisal Fraud Defendants' misrepresentations, acts of concealment and

failures to disclose were knowing and intentional and made for the purpose of deceiving

Plaintiffs and obtaining their money and property for Appraisal Fraud Defendants ' gain.

302.    Appraisal Fraud Defendants either knew or recklessly disregarded the fact

that the misrepresentations and omissions described above were material, and Plaintiffs

relied on the misrepresentations and omissions set forth above.

303.    As a result of Appraisal Fraud Defendants' fraudulent schemes, Appraisal

Fraud Defendants have obtained money and property belonging to Plaintiffs, and

Plaintiffs have been injured in their business or property by Appraisal Fraud Defendants'

overt acts of mail, wire and bank fraud.

### Pattern of Racketeering Activity – Ginn Financial Enterprise

304.    Appraisal Fraud Defendants did knowingly, willfully and unlawfully

conduct or participate in the affairs of the Ginn Financial Enterprise through a "pattern

of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and

1962(c). The racketeering activity was made possible by the Appraisal Fraud

Defendants' regular and repeated use of the facilities and services of the Ginn Financial Enterprise.

305.     Appraisal Fraud Defendants committed or aided and abetted in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341, 1343 and 1344 as described above, within the past five years ("Racketeering Acts"). Appraisal Fraud Defendants' Racketeering Acts were not isolated, but rather had the same or similar purpose, participants, method of commission, and victims, including Plaintiffs.

306.     Each of the Racketeering Acts were committed pursuant to and in furtherance of the Ginn Financial Enterprise, and such acts include false and misleading statements, as well as other uses of the mails and wire transmissions, to further and execute Defendants' scheme and artifice to defraud.

307.     The multiple Racketeering Acts that Appraisal Fraud Defendants committed and/or conspired to commit and/or aided and abetted the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## COUNT I
### Violation of 18 U.S.C. § 1962(c):  RICO – The Credit Suisse Credit Facility Fraud

**(All Plaintiffs Against Defendants Lubert-Adler, Lubert-Adler Fund III, Lubert-Adler Fund IV, Lubert-Adler Fund V, Dean Adler, ERG, Ginn West End, Ginn-LA West End LLLP, Ginn-LA CS Borrower, Ginn-LA Conduit Lender and Ginn-LA OBB)**

308.     Plaintiffs re-allege the allegations set forth in Paragraphs 1-21, 26-222 and 266-285 as though fully set forth below.

309.     CSCF Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or

participating directly or indirectly in the conduct of the affairs of the CSCF Enterprise

through a pattern of racketeering activity, including acts indictable under 18 U.S.C.

§§1341 and 1343.

310.     As a direct and proximate result, Plaintiffs and members of the Class

have been injured in their business or property by the predicate acts that make up CSCF

Defendants' pattern of racketeering activity through the CSCF Enterprise.

## COUNT II
### Violation of 18 U.S.C. § 1962(d): RICO – The Credit Suisse Credit Facility Fraud
**(All Plaintiffs Against Defendants Lubert-Adler, Lubert-Adler Fund III,
Lubert-Adler Fund IV, Lubert-Adler Fund V, Dean Adler, ERG, Ginn
West End, Ginn-LA West End LLLP, Ginn-LA CS Borrower, Ginn-LA
Conduit Lender and Ginn-LA OBB)**

311.     Plaintiffs re-allege the allegations set forth in Paragraphs 1-21, 26-222,

266-285 and 308-310 as though fully set forth below.

312.     In violation of 18 U.S.C. § 1962(d) CSCF Defendants have, as set forth

above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced at least as

early as 2004 and continues.  The object of the conspiracy was to secure the $675

million CSCF, obtain a $333 million distribution from the CSCF for Defendants

Lubert-Adler and ERG and conceal the existence, terms, defaults, and effects of the

CSCF on the development of GSM.

313.     As set forth above, each CSCF Defendant knowingly, willfully and

unlawfully agreed and combined to conduct or participate in, directly or indirectly, the

conduct of the affairs and activities of the CSCF Enterprise through a pattern of

racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in

violation of 18 U.S.C. § 1962(c).

314.     CSCF Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy.

315.     The purpose of the acts that caused injury to Plaintiffs was to advance the overall objective of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of CSCF Defendants' schemes.

316.     As a direct and proximate result, Plaintiffs have been injured in their business or property by CSCF Defendants' conspiracy and by the predicate acts that make up CSCF Defendants' pattern of racketeering activity through the CSCF Enterprise.

**COUNT III**

**Violation of 18 U.S.C. § 1962(c):  RICO – The Ginn Financial Fraud**

**(All Plaintiffs against Defendants Ginn Financial, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Title and Bobby Ginn)**

317.     Plaintiffs re-allege the allegations set forth in Paragraphs 1-15, 22-27, 223-265 and 286-307 as though fully set forth below.

318.     Appraisal Fraud Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Ginn Financial Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343.

319.     As a direct and proximate result, Plaintiffs and members of the Class have been injured in their business or property by the predicate acts that make up Appraisal Fraud Defendants' pattern of racketeering activity through the Ginn Financial Enterprise.

<u>**COUNT IV**</u>

<u>**Violation of 18 U.S.C. § 1962(d): RICO – The Ginn Financial Fraud**</u>

**(All Plaintiffs against Defendants Ginn Financial, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Title and Bobby Ginn)**

320.     Plaintiffs re-allege the allegations set forth in Paragraphs 1-15, 22-27, 223-265, 286-307 and 317-319 as though fully set forth below.

321.     In violation of 18 U.S.C. § 1962(d) Appraisal Fraud Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c). The conspiracy commenced at least as early as 2004 and continues. The object of the conspiracy was to sell and finance GSM lots at unjustified and inflated prices resulting in increased profits for Appraisal Fraud Defendants.

322.     As set forth above, each Mortgage Fraud Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate in, directly or indirectly, the conduct of the affairs and activities of the Ginn Financial Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in violation of 18 U.S.C. § 1962(c).

323.     Appraisal Fraud Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy.

324.     The purpose of the acts that caused injury to Plaintiffs was to advance the overall objective of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of Appraisal Fraud Defendants' scheme.

325.     As a direct and proximate result, Plaintiffs have been injured in their business or property by Mortgage Fraud Defendant' conspiracy and by the predicate acts that make up Appraisal Fraud Defendants' pattern of racketeering activity through the Ginn Financial Enterprise.

## COUNT V
### Breach of Fiduciary Duty
**(Mortgagor Plaintiffs against Defendants Ginn Financial, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Title and Bobby Ginn)**

326.     Plaintiffs re-allege the allegations set forth in Paragraphs 1-15, 22-27, 223-265 and 286-307 as though fully set forth below.

327.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Financial, Ginn Title and Bobby Ginn stood to benefit from the financing of Mortgagor Plaintiffs' GSM mortgage loans at the expense of Mortgagor Plaintiffs.

328.     Defendants Ginn Financial and Bahamas Sales exercised extensive control over Mortgagor Plaintiffs' GSM loans by virtue of the actions described in Paragraphs 223-265 and 286-307, above.

329.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Defendants Ginn Financial and Bahamas Sales to take on extra services for Mortgagor Plaintiffs beyond the performance of Bahamas Sales's contractual duties under Mortgagor Plaintiffs' GSM mortgage notes, including the following:

   a.  After warning that Bahamian financing was complex, Ginn Financial offered to advise Mortgagor Plaintiffs on the requirements necessary to obtain mortgage financing on a lot located in the Bahamas.

   b.  Ginn Financial offered to have a Ginn representative personally deliver mortgage closing documents to Mortgagor Plaintiffs Hoyer, so Mortgagor Plaintiffs Hoyer would not have to travel to the Bahamas to close on their GSM mortgage loans.

   c.  Ginn Financial sent mortgage closing documents to Mortgagor Plaintiffs Taliaferro, Maciag, Fresonke, Clemmons, Carell via FedEx, so those Mortgagor

Plaintiffs would not have to travel to the Bahamas to close on their GSM mortgage loans.

330.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Ginn Financial, Bahamas Sales, Ginn Title and Bobby Ginn took the following steps to reassure Mortgagor Plaintiffs that even though they were purchasing land located in the Bahamas, Ginn Financial mortgage financing for GSM lots offered protections that are customary for mortgage financing of real property in the United States.  Those defendants represented that:

    a.  Ginn Financial was offering specialized loan programs for GSM lot purchasers.

    b.  Ginn Financial was the preferred lender for GSM lot purchasers.

    c.  Ginn Financial was a licensed mortgage lender in the State of Florida.

    d.  Ginn Financial would guide Mortgagor Plaintiffs through the process of obtaining a mortgage loan for Bahamian lots.

    e.  Ginn Financial "in-house" mortgage financing of GSM lots would expedite the closing process.

    f.  Ginn Financial was offering 80% loan-to-value mortgage loans on GSM lots, whereas Bahamian banks would only offer mortgage loans at 50% loan-to-value.

    g.  Ginn Financial required Mortgagor Plaintiffs to use U.S. real estate appraiser Pomeroy Appraisal Associates of Florida, Inc. "as a condition of your loan on this property, to represent our interests in the transaction."

331.     By taking the actions described in Paragraphs 228-232 and 330, above, Defendants Ginn Financial and Bahamas Sales encouraged Mortgagor Plaintiffs to place their trust and confidence in those Defendants to provide mortgage financing

that offered protections customary in the United States, including a licensed U.S. mortgage lender and a licensed U.S. appraiser obligated to follow the Uniform Standards of Professional Appraisal Practice.

332.     Mortgagor Plaintiffs placed their confidence and trust in Defendants Ginn Financial and Bahamas Sales. Mortgagor Plaintiffs relied on Ginn Financial and Bahamas Sales to provide guidance in connection with the financing of property in the Bahamas. Mortgagor Plaintiffs relied on Ginn Financial and Bahamas Sales to close their GSM mortgage loans with Ginn Financial (as a Florida licensed mortgage lender) and to appraise their GSM lots with Pomeroy (as a Florida licensed appraiser) or some other U.S. licensed appraiser.

333.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Financial, Ginn Title and Bobby Ginn knew or had reason to know Plaintiffs were placing their trust and confidence in Ginn Financial and Bahamas Sales.

334.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Financial, Ginn Title and Bobby Ginn assumed a duty to Plaintiffs to disclose information material to the financing of Plaintiffs' GSM mortgage loans, which information was peculiarly within the knowledge of those Defendants and not otherwise available to Plaintiffs.

335.     Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Financial, Ginn Title and Bobby Ginn had knowledge of and participated in the appraisal fraud being perpetrated upon GSM lot purchasers, including

Plaintiffs, and entered into GSM mortgage notes with Plaintiffs in furtherance of the appraisal fraud.

336.     Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Defendants Ginn Financial and Bahamas Sales to breach their fiduciary duty to Mortgagor Plaintiffs by not acting in Mortgagor Plaintiffs' best interests.

337.     Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Defendants Ginn Financial and Bahamas Sales to breach their fiduciary duty to Mortgagor Plaintiffs by suborning fraudulently inflated appraisals from Pomeroy.

338.     Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn caused Defendants Ginn Financial and Bahamas Sales to breach their fiduciary duty to Mortgagor Plaintiffs by suborning and utilizing fraudulently inflated appraisals from Carver Grant.

339.     Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn directed Defendants Ginn Financial and Bahamas Sales to breach their fiduciary duty to Mortgagor Plaintiffs by concealing the facts that:

a. Mortgagor Plaintiffs' GSM mortgage loans were not closed with Florida licensed mortgage lender Ginn Financial, or with any other U.S. licensed mortgage lender. Instead, those mortgage loans were closed with single purpose entity Bahamas Sales, which was not a licensed mortgage lender, correspondent mortgage lender or mortgage broker in any state

b. Mortgagor Plaintiffs' GSM lots were not appraised by Pomeroy Apparisal, or with any other U.S. licensed appraiser. Instead, those lots were "appraised" by Carver Grant, which was not a U.S. licensed appraiser and did not follow the

Uniform Standards of Professional Appraisal Practice, or any other recognized standards for appraisal practices.

c. The Carver Grant appraisals used to underwrite and approve Mortgagor Plaintiffs' GSM mortgage loans included value for infrastructure and amenities that did not exist as of the date of those appraisals, but did not make such value "subject to" the completion of the nonexistent infrastructure and amenities.

d. The Carver Grant appraisals were inflated by hundreds of thousands of dollars per lot.

340.      Because Mortgagor Plaintiffs were unaware of the appraisal fraud scheme and the facts described in Paragraph 339, Mortgagor Plaintiffs were damaged from the moment they closed on their GSM mortgage loans and their GSM lot purchases as set forth above.

341.      Mortgagor Plaintiffs' damages occurred as a direct and proximate result of the breach of fiduciary duty by Ginn Financial and Bahamas Sales (as directed by Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn) because Mortgagor Plaintiffs would not have closed on their GSM mortgage loans and their GSM lot purchases if they had known the true facts.

## COUNT VI
### Fraud in the Inducement
**(Mortgagor Plaintiffs against Defendants Ginn Financial, Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Title and Bobby Ginn)**

342.      Plaintiffs re-allege the allegations set forth in Paragraphs 1-15, 22-27, 223-265 and 286-307 as though fully set forth below.

343.    Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas
Sales, Ginn Financial, Ginn Title and Bobby Ginn concealed the appraisal fraud
scheme and the following facts in order to induce Mortgagor Plaintiffs' to enter into
the GSM Mortgage Notes:

a.   Mortgagor Plaintiffs' GSM mortgage loans were not closed with Florida licensed
     mortgage lender Ginn Financial, or with any other U.S. licensed mortgage lender.
     Instead, those mortgage loans were closed with single purpose entity Bahamas
     Sales, which was not a licensed mortgage lender, correspondent mortgage lender
     or mortgage broker in any state.

b.   Mortgagor Plaintiffs' GSM lots were not appraised by Pomeroy Apparisal, or
     with any other U.S. licensed appraiser.  Instead, those lots were "appraised" by
     Carver Grant, which was not a U.S. licensed appraiser and did not follow the
     Uniform Standards of Professional Appraisal Practice, or any other recognized
     standards for appraisal practices.

c.   The Carver Grant appraisals used to underwrite and approve Mortgagor
     Plaintiffs' GSM mortgage loans included value for infrastructure and amenities
     that did not exist as of the date of those appraisals, but did not make such value
     "subject to" the completion of the nonexistent infrastructure and amenities.

d.   The Carver Grant appraisals were inflated by hundreds of thousands of dollars
     per lot.

344.    Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas
Sales, Ginn Financial, Ginn Title and Bobby Ginn knew the existence of the appraisal
fraud scheme and the facts set forth in Paragraph 343 were material to Mortgagor

Plaintiffs' decisions to enter into the GSM Mortgage Notes. Those Defendants knew that if Mortgagor Plaintiffs' were informed of the appraisal fraud scheme or the facts set forth in Paragraph 343, Mortgagor Plaintiffs would not have entered into the GSM Mortgage Notes.

345. Defendants Lubert-Adler, Lubert-Adler Fund IV, Dean Adler, Bahamas Sales, Ginn Financial, Ginn Title and Bobby Ginn intended that their concealment of the facts set forth in Paragraph would induce Mortgagor Plaintiffs to enter into the GSM Mortgage Notes.

346. Because Mortgagor Plaintiffs were unaware of the appraisal fraud scheme or the facts set forth in Paragraph 343, they agreed to close on their GSM mortgage loans and their GSM lot purchases. Mortgagor Plaintiffs would not have closed on their GSM mortgage loans and their GSM lot purchases if they had known the true facts.

347. Mortgagor Plaintiffs were damaged from the moment they closed on their GSM mortgage loans and their GSM lot purchases as set forth above. Mortgagor Plaintiffs' damages occurred as a direct and proximate result of the breach of fiduciary duty by Ginn Financial and Bahamas Sales (as directed by Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn) because Mortgagor Plaintiffs would not have entered into the GSM mortgage Notes or closed on their GSM mortgage loans and their GSM lot purchases if they had known the true facts.

## PRAYER FOR RELIEF

**Plaintiffs hereby pray for the following relief:**

A. A determination that Defendants have violated 18 U.S.C. §§ 1962(c) and (d);

B. An injunction prohibiting Defendants from further violations of 18 U.S.C. §§ 1962(c) and (d);

C. A determination that Defendants Ginn Financial and Bahamas Sales (as directed by Lubert-Adler, Lubert-Adler Fund IV, Dean Adler and Bobby Ginn) breached their implied fiduciary duty to Mortgagor Plaintiffs;

D. A determination that the mortgages and mortgage notes entered into by the Mortgagor Plaintiffs should be declared null and void as a consequence of the Appraisal Fraud Scheme and the fraudulent inducement;

E. As to the Breach of Fiduciary Duty and Fraudulent Inducement Counts, leave of court to seek to plead punitive damages at the appropriate time;

F. As to all Counts, an order that Defendants pay damages in an amount to be determined at trial;

G. As to all Counts, an order that Defendants pay treble the amount of damages suffered by Plaintiffs;

H. An order of restitution of all payments and charges that Defendants improperly collected from Plaintiffs;

I. A determination that Defendants are jointly and severally liable as to all Counts herein;

J. An award to Plaintiffs of the costs and disbursements incurred in connection will this action, including reasonable attorneys' fees and the reimbursement of expenses in amounts to be determined by the Court;

K. An award to Plaintiffs of prejudgment interest;

L. Trial by Jury of all issues triable as of right by a jury; and

M.  Such other and, further relief as the Court may deem just and proper.

February 28, 2011

Dana L. Ballinger – Trial Counsel
Attorney for Plaintiffs
Florida Bar No. 35278
BALLINGER LAW OFFICE
747 Windlass Way
Sanibel, Florida 33957
(239) 395-7672
dballinger@ballingerlawoffice.com

152